MICHIGAN FARM BUREAU *v.* SECRETARY OF STATE.

OPINION OF THE COURT.

1. CONSTITUTIONAL LAW—INTERPRETATION.

The Constitution derives its force from the people who ratified it, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding.

2. SAME—CONSTRUCTION—REFERENDUM.

The referendum, being a specific power which the people have expressly reserved to themselves in the Constitution, must be saved if possible against conceivable, if not likely, evasion by the legislature (Const 1963, art 2, § 9).

3. SAME—CONSTRUCTION.

A clause or section of a Constitution should not be construed so as to impede or defeat its generally understood ends when another construction, equally concordant with the words and sense of that clause or section, will guard and enforce those ends.

4. SAME—REFERENDUM—TIME—INTERPRETATION.

Constitutional section providing that referendum of legislation must be invoked within 90 days following the final adjournment of the legislative session at which the law was enacted *held,*

REFERENCES FOR POINTS IN HEADNOTES

[1] 16 Am Jur 2d, Constitutional Law § 75.
[2] 16 Am Jur 2d, Constitutional Law §§ 64, 65, 75, 76, 87, 90.
[3] 16 Am Jur 2d, Constitutional Law §§ 64, 65.
[4] 16 Am Jur 2d, Constitutional Law §§ 60–63.
[5] 28 Am Jur, Initiative, Referendum and Recall §§ 44–47.
[6] 16 Am Jur 2d, Constitutional Law §§ 75–77.
[7, 10, 11] 50 Am Jur, Statutes § 222; 52 Am Jur, Time §§ 4, 7.
[8] 50 Am Jur, Statutes § 222.
[9] 28 Am Jur, Initiative, Referendum and Recall §§ 16, 19–22.
[12] 28 Am Jur, Initiative, Referendum and Recall §§ 44–47; 52 Am Jur, Time §§ 4, 7.

to allow invocation of the referendum before the final adjournment of the legislative session, as well as during the 90 days following final adjournment (Const 1963, art 2, § 9).

5. SAME—STATUTES—REFERENDUM.

A duly filed referendum petition with respect to a statute has the effect of nullifying the particular measure referred until its approval by the voters, inferentially leaving the legislature in full possession of all other ordinary constitutional powers (Const 1963, art 2, § 9).

6. STATUTES—WORDS AND PHRASES—BY LAW—CONSTRUCTION.

Phrase "by law" in Federal uniform time act of 1966, providing that any State might exempt itself by law from the operation of daylight saving time, held, to mean not only by statutes enacted by the legislature of a State, but also by laws effected by the people of the State through the referendum process found in the State Constitution (15 USCA §§ 260–267; Const 1963, art 2, § 9).

7. TIME—FEDERAL UNIFORM TIME ACT—CHANGEOVER DATE.

Federal uniform time act held, not to establish but one changeover date for daylight saving time, so as to require legislative action respecting exemption from its operation to be taken prior to the intended period of exemption (15 USCA §§ 260–267).

8. STATUTES—FEDERAL ACT—CONSTRUCTION BY STATE COURT.

The State Supreme Court has the original duty to interpret and apply a section of a Federal statute where there is as yet no authoritative Federal precedent, since a Federal statute is made supreme by the Constitution of the United States (US Const, Am 6, § 2).

9. SAME—REFERENDUM—PETITION—FORM.

Petition circulated for referendum of statute exempting Michigan from the operation of daylight saving time, having all of such statute printed as part of the petition for referral and the petition otherwise being correct as to legal form, held, to be in proper form for submission to the board of State canvassers (PA 1967, No 6).

SEPARATE OPINION.

ADAMS, J.

10. TIME—FEDERAL UNIFORM TIME ACT—CONGRESSIONAL INTENT.

*The intention of the congress in enacting the Federal uniform time act of 1966 was to establish but one set of changeover*

*dates each year, for changing to daylight saving time in April
and changing back to standard time in October, in States
observing daylight saving time (15 USCA §§ 260–267).*

11. SAME—FEDERAL UNIFORM TIME ACT—PRE-EMPTION.

*The Federal uniform time act of 1966 pre-empted the field as
to daylight saving time within each time zone unless a State
exempted itself from the provision for the advancement of time
(15 USCA §§ 260–267).*

12. SAME—EXEMPTION—EFFECT.

*The statute exempting the State from observance of daylight
saving time was in effect on the date fixed by the Federal
uniform time act of 1966 for time changeover, and no change-
over could take place later even though the exemption statute
became ineffective upon filing of referendum petitions (15
USCA §§ 260–267; PA 1967, No 6).*

Appeal from Court of Appeals prior to decision,
pursuant to GCR 1963, 852. Submitted June 9,
1967. (Calendar No. 13, Docket No. 51,762.) De-
cided June 9, 1967. Opinion filed July 21, 1967.

Complaint in the Court of Appeals for mandamus
and injunctive relief by Michigan Farm Bureau,
and others against the Secretary of State, the Board
of State Canvassers, the Michigan State Chamber
of Commerce, the Citizen's Committee for Daylight
Saving Time Referendum, and the Michigan Retail-
er's Association, to prevent the reception and cer-
tification of petitions for referendum of statute
exempting Michigan from the Federal uniform time
act of 1966. Complaint dismissed by the Court of
Appeals for prematurity. Plaintiffs applied for
rehearing in the Court of Appeals, and moved for
leave to appeal to the Supreme Court prior to deci-
sion by the Court of Appeals, pursuant to GCR
1963, 852. Leave granted, and summary hearing
ordered. Complaint dismissed.

*Bernard J. Fieger* and *Tom Downs* (*William Wilkinson,* of counsel), for plaintiffs.

*Frank J. Kelley,* Attorney General and *Robert A. Derengoski,* Solicitor General, for defendants Secretary of State and Board of State Canvassers.

*MacLean, Seaman & Laing,* for defendants Michigan Retailer's Association and Citizen's Committee for Daylight Saving Time Referendum.

PER CURIAM. By order for bypass and summary hearing entered May 23 last, the Court has concerned its appellate function with the reserved referendary power and procedure appearing in the first two paragraphs of section 9 of article 2 of the Constitution of 1963. See margin below.[1] It has approached the primary question thus far determined (order of June 9, 1967; see *appendix*) with attention concentrated from the beginning on the all important duty of the judiciary when constitutional provisions are brought up for interpretation and application. That duty is to ascertain as best the Court may the general understanding and therefore the uppermost or dominant purpose of the people when they approved the provision or

[1] "SEC. 9.   The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum.   The power of initiative extends only to laws which the legislature may enact under this constitution.   The power of referendum does not extend to acts making appropriations for State institutions or to meet deficiencies in State funds and must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law was enacted. To invoke the initiative or referendum, petitions signed by a number of registered electors, not less than eight percent for initiative and five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.

"No law as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a majority of the electors voting thereon at the next general election."

provisions thus brought up.   To quote Mr. Justice Story:

"Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research.   They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss."   (1 Story, Constitution [5th ed], § 451, p 345.);

and Mr. Justice COOLEY (from *May* v. *Topping,* 65 W Va 656, 660 [64 SE 848]):

"A Constitution is made for the people and by the people. *The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.* 'For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding,* and ratified the instrument in the belief that that was the sense designed to be conveyed.'   (Cooley's Constitutional Limitations [6th ed], 81.)"

Plaintiffs contend under the two mentioned paragraphs that the aforesaid reserved power cannot "properly" be invoked as against a legislative measure given immediate effect until end of the legislative session during which that measure was enacted and

given such effect. The defendants, supported by the attorney general, stand for the contrary view. This is the primary question to which we have referred.

The attorney general advises, in his brief: .

"On April 13, 1966, the United States Congress enacted the uniform time act of 1966, being Public Law 89–387 of the 89th Congress.[2] This act imposes uniform daylight saving time upon all States during the period beginning the last Sunday in April of each year and terminating on the last Sunday in October of each year; but section 3(a) of said congressional act specifically provides that:

* * *

" 'Except that any State may by law exempt itself from the provisions of this subsection providing for the advancement of time, but only if such law provides that the entire State (including all political subdivisions thereof) shall observe the standard time otherwise applicable under such act of March 19, 1918 [15 USC §§ 261–264], as so modified, during such period.'

"The Michigan legislature enacted and the governor signed Senate Bill No 1 which is denoted PA 1967, No 6, giving said act an immediately effective date of March 24, 1967.[3]

"Following enactment of PA 1967, No 6, certain individuals and groups publicly announced their plans to circulate a referendum petition with the intention of filing such petition as soon as a sufficient number of signatures had been obtained. These individuals and groups did, in fact, circulate such referendum petition and filed same with the State board of canvassers."

A number of warring rules for construction of those pivotal words, "within 90 days following the

---

[2] 80 Stat 107–109 (15 USCA, §§ 260–267).

[3] MCLA 1969 Cum Supp §§ 435.211–435.213 (Stat Ann 1968 Cum Supp §§ 18.872[1]–18.872[3]).—REPORTER.

final adjournment of the legislative session at which the law was enacted," are urged upon us. It is said on the one hand that "strict" construction is in order and that, if the worded purpose is at all doubtful, it should be resolved "in favor of the legislative process and against the referendum process." On the other, citing authority that the word "within" as employed in statutes providing time for the taking of legal action means "not beyond," or "not later than," or "any time before,"[4] it is alleged that "within" does not fix the first point of time; that it does fix the limit beyond which action may not be taken.

The issue is not without difficulty. There is nevertheless an overriding rule of constitutional construction which requires that the commonly understood referral process, forming as it does a specific power the people themselves have expressly reserved, be saved if possible as against conceivable if not likely evasion or parry by the legislature. That rule is, in substance, that no court should so construe a clause or section of a constitution as to impede or defeat its generally understood ends when another construction thereof, equally concordant with the words and sense of that clause or section, will guard and enforce those ends. The rule seems to have originated with the handing down of *Prigg* v. *Commonwealth of Pennsylvania,* 41 US (16 Pet) 539, 612 (10 L ed 1060, 1088):

---

4 An example of these authorities is *Duddy* v. *Conshohocken Printing Company*, 163 Pa Super 150, 154 (60 A2d 394, 395):

"The word 'within' has a number of meanings which are set forth in the various dictionaries and in the judicial decisions collected in 45 Words and Phrases (Perm ed), beginning at page 378. While *one* of the meanings is to fix both the beginning and the end of the period of time in which to act, another meaning, well recognized, is synonymous with 'not later than,' or 'any time before,' or 'before the expiration of.' In this sense it fixes *the end* but *not the beginning* of the period [citing authorities]."

"How, then, are we to interpret the language of the clause? The true answer is, in such a manner, as, consistently with the words, shall fully and completely effectuate the whole objects of it. If by one mode of interpretation the right must become shadowy and unsubstantial, and without any remedial power adequate to the end, and by another mode it will attain its just end and secure its manifest purpose, it would seem, upon principles of reasoning, absolutely irresistible, that the latter ought to prevail. No court of justice can be authorized so to construe any clause of the Constitution as to defeat its obvious ends, when another construction, equally accordant with the words and sense thereof, will enforce and protect them",

and accords fully with Mr. Justice Cooley's regularly quoted declaration in *People, ex rel. Bay City,* v. *State Treasurer,* 23 Mich 499, 506:

"Constitutions do not change with the varying tides of public opinion and desire; the will of the people therein recorded is the same inflexible law until changed by their own deliberative action; and it cannot be permissible to the courts that in order to aid evasions and circumventions, they shall subject these instruments, which in the main only undertake to lay down broad general principles, to a literal and technical construction, as if they were great public enemies standing in the way of progress, and the duty of every good citizen was to get around their provisions whenever practicable, and give them a damaging thrust whenever convenient."

The construction claimed here by plaintiffs would permit outright legislative defeat, not just hindrance, of the people's reserved right to test, by referendary process, the exemption made by Act No 6 or any like immediate-effect exemption the legislature might enact come the showers of April

each year hereafter. To be specific: With such construction announced judicially, the legislature would stand free to avoid effective referral of this and future legislative exemptions under aforesaid 3(a) simply by repealing Act No 6 next November, then by enacting another immediate-effect act of exemption next spring and then by another repealer in the late fall, and so on through the years. For that particular reason plaintiffs' proposed interpretation of the first two paragraphs of section 9 has been rejected and that proposed by defendants and by the attorney general has been accepted. Our order of June 9 attests that result. We elaborate:

Should we adopt plaintiffs' procedural view of section 9, what would prevent more or less regular thwart of the referral process, at will of the legislature? The legislative power of Michigan having been committed generally to the senate and house by section 1 of article 3 of the Constitution, what then of warranted worth would be left in section 9 beyond, of course, the slower and more involved initiatory process? Quite unintentionally to be sure, plaintiffs are requesting that the judicial branch emasculate the reserved referral process. They are a bit too literal as they view section 9, at least too much for that necessary "play" in the joints Mr. Justice Holmes once described (*Bain Peanut Company* v. *Pinson,* 282 US 499, 501 [51 S Ct 228, 229, 75 L ed 482, 491]):

"The interpretation of constitutional principles must not be too literal. We must remember that the machinery of government would not work if it were not allowed a little play in its joints."

We are impressed by what seems to be the only pinpointed and wholly unanimous authority extant, that is, *McBride* v. *Kerby,* 32 Ariz 515 (260 P 435).

Reasoning from a Constitution which corresponds in pertinent essence with ours, the supreme court of Arizona concluded in *McBride* (p 523) that:

"Nowhere in the Constitution can be found even a suggestion that a referendum petition has any effect except the nullification of the particular measure referred until its approval by the voters, which inferentially would leave the legislature in full possession of all other ordinary constitutional powers."

These words were followed by a detailed analysis of the history of the power of referendum and of the evils sought to be remedied thereby; by due adherence to that rule of constitutional construction which would effectuate rather than frustrate such reserved power, and then by conclusion that, after a measure has been referred and prior to the taking of the referendary vote, the legislature may—nay, must needs be left free to—legislate anew in the same area, subject always to the referral process should a sufficient number of electors petition therefor. This descriptive analysis of *McBride* given, we commend to our profession for application to said section 9 the conclusory reasoning of the court in that case (emphasis supplied by the Arizona supreme court, p 523):

"Taken into consideration with subdivision 5, the only logical and consistent interpretation is that when an act of the legislature is referred, *that particular act* is suspended in its operation, but that such *suspension* does not deprive the legislature of the right thereafter to pass, in the legal manner any measure it may deem advisable, notwithstanding such measure may deal with exactly the same subject as the referred act, and in the same manner, but subject, of course, to the same right of reference as was the original act,"

Three additional questions were considered and merged in the Court's order of June 9, mentioned above.

The first was whether by 3(a) of the act of April 13, 1966, congress limited the extended exemptive authority to action by the *legislature* of "any State," or whether such exemptive authority was extended to the State's reserved power to propose laws, to enact and reject laws, and to approve or reject laws. Upon the specific reasoning of *Decher* v. *Secretary of State*, 209 Mich 565, 572–578, it is ruled that the people of Michigan may themselves, by proceedings taken pursuant to said section 9, effect or reject the exemption thus authorized. Here congress has awarded the exemptive right to "any State", not just to the *legislature* of the State. This means that the acceptance or rejection of the exemption may be accomplished "by law" effected by the people of the State as well as by the legislature of that State. See discussion in *Decher of State of Ohio, ex rel. Davis*, v. *Hildebrant*, 94 Ohio St 154 (114 NE 55), affirmed *Davis* v. *Ohio*, 241 US 565 (36 S Ct 708, 60 L ed 1172), and this Court's conclusion with respect to the referral provision of the Ohio constitution considered there (*Decher* at 573) :

"The laws of the State include the Constitution as well as the statutes, and, when congress provided that the redistricting should be made 'in the manner provided by the laws' of the States, the provision in the State Constitution for a referendum on the action of the legislature could not but apply. We do not think this decision places any interpretation upon the word 'legislature' as used in this constitutional provision. It simply holds that, as congress was given the power to regulate the action of the States in redistricting, it might confer upon the States the right to provide therefor 'in the manner

provided by the laws' of each State and that the law of Ohio included the referendum provision of its Constitution."

The second question thus merged is based on contention that the act of April 13, 1966, authorizes but one "changeover date" each year and since the last Sunday of April, 1967, passed after the legislature had effected a changeover, by Federal edict there may be no change of the situation until one is made, if at all, precedently for 1968. The point is made by plaintiffs' stated question 4:

"Does the Federal uniform time act (Public Law 89–387) pre-empt the determination of time, establish but one 'changeover date' for daylight savings time, and preclude the board of State canvassers or the State of Michigan from making any determination of time other than that specifically authorized by such Federal legislation?"

Question 4 poses an open question of interpretation and application of law made supreme by the sixth article[5] of the Constitution of the United States, with respect to which there is as yet no authoritative Federal precedent. It thus becomes the original duty of this Court to interpret and apply entire section 6 of the act of April 13, 1966, rights thereunder having been duly asserted before it. As regards such duty see *United States* v. *Bank of New York & Trust Co.*, 296 US 463, 479 (56 S Ct 343, 348, 80 L ed 331, 339).

The phrasing of section 6 suggests no thought that the extended power of exemption must be exercised *prior* to the Sunday in April which precedes the intended period of exemption. Neither does it purport to forestall exemptive action covering all or any portion of the Sunday-to-Sunday

---

[5] US Const, art 6, § 2.—REPORTER.

period ahead should the legislative assembly of the State fail, for any reason, to act prior to the first of the two Sundays. The only restriction laid by congress upon the power thus extended is that, when and if exercised, the result must apply to the entire State. It is therefore ruled that question 4 must be answered in the negative.

To hold otherwise would inhibit any and all legislatively enacted and immediately effective exemptions for the current year, whether legislatively enacted legislation of the given State is or is not subject to the referendum, once that April Sunday has passed into history. This would be inexorable even though a near unanimous public demand for exemption should well up spontaneously after that April Sunday has passed, the assembly meanwhile being quiescent.

The third and last question is presented by plaintiff's stated question 3:

"Are the petitions in the proper form for submission to the board of state canvassers?"

The Court has examined the form of the petition as submitted with the briefs and finds that plaintiffs' objections thereto are without merit. *Leininger v. Secretary of State,* 316 Mich 644, has no application here in specific fact. In *Leininger* an *initiatory* petition was held fatally defective for want of inclusion of a constitutionally required title of the measure sought to be initiated, whereas the instant petition is one of referral of a measure already passed by the legislature. The instant petition appears as being a pretty fair model of the constitutional means by which a sufficient number of validly signing electors may succeed in referring to the electorate a measure already enacted into law; all of such enacted measure having been

printed as a part of the petition for referral and the petition otherwise being correct as to legal form.

This opinion *per curiam* presents the constitutionally required reasons for the decision made June 9 by order. For the order, see the appendix hereto. No costs are awarded.

Kelly, Black, T. M. Kavanagh, Souris, O'Hara, and Brennan, JJ., concurred.

## APPENDIX

(Order entered June 9, 1967, denying mandamus and injunction and dissolving stay order)

"The Court having found (a) that there is no constitutional or other bar to the circulation and filing of the referendary petition here involved prior to adjournment of the legislative session at which PA 1967, No 6, was passed; and (b) that said petition is not invalid *as to form:*

"It Is Ordered that plaintiffs' complaint for mandamus and injunctive relief, brought here for determination by the Court's order of May 23, 1967, is denied. The Court's order staying the board of State canvassers from making official determination of the sufficiency of such referendary petition is dissolved. An opinion or opinions will follow."

Adams, J. (concurring). I concur in the above *Per Curiam* opinion except for that portion which deals with the question whether or not the Federal uniform time act (Public Law 89-387) authorizes but one set of changeover dates each year.

The Committee on Commerce Report No 268 to accompany S. 1404 which became Public Law 89-387 of the 89th Congress states:

"*The purpose of the bill is to establish uniform dates for the commencing and ending of daylight saving time in the States and local jurisdictions*

*where it is observed.* It is designed to eliminate a major part of the costly, wasteful confusion which results from current conflicts in the Nation's time standards.   *   *   *

"Variations in the observance of daylight saving time, time zone boundary shifts, and numerous local options have all combined to create what witnesses described to the committee as a bewildering and costly confusion in the timekeeping practices of the Nation.   *   *   *

"There are two basic causes for the timekeeping confusion. One involves the situation in which individual communities, often adjacent to one another, observe different time standards—some on daylight saving time and others on standard time. A great number of local government units make separate decisions on whether to adopt daylight saving time or remain on standard time during the summer months. The result in some areas of the country is a patchwork of small areas using different time standards.

"The second cause of confusion *is that States and local political subdivisions select different dates for starting and stopping the use of daylight saving time, some observing it for 6 months, some for 3 months, and others for periods in between.*

"S. 1404 *is designed to correct the second of these causes: the variation in the time of adoption and termination of daylight saving time.* In those jurisdictions where daylight saving time is adopted, its duration would be fixed, under the bill, from the last Sunday in April to the last Sunday in October.   *   *   *

"The bill would also declare the express intent of Congress *to supersede all laws of the States and their political subdivisions which specify different dates for the observance of daylight saving time.* The committee is, of course, aware that in pre-empting the field, with respect to changeover dates, it is taking a new, though limited, step in respect to time standards and practices. However, it is con-

vinced that no other course of action can effectively cope with the problems of time confusion.

"It should be emphasized that the bill leaves untouched the local, or State, jurisdiction over the more important power of deciding whether or not to adopt daylight saving time at all. The bill will not impose daylight saving time on anyone. Nor will it deny it to anyone. States and local units of government will be free, as they have been in the past, to decide whether or not to go on daylight saving time. *However, if they select daylight saving time, they must observe it for the period set forth in the bill.*" (Emphasis supplied.)

Report No 1315 of the 89th Congress, 2d Session, House of Representatives, by the committee on Interstate and Foreign Commerce, to whom was referred HR. 6785 to establish uniform dates throughout the United States for the commencing and ending of daylight saving time in those States and local jurisdictions where it is observed, reiterates the senate committee report and further comments on the necessity for the legislation as follows:

"There is a consensus approaching unanimity on the desirability of a greater adherence to uniform time standards from place to place throughout the Nation. * * *

"The confusion which is caused by the independent action not only of the several States but also of counties and municipalities within the States is perhaps best exemplified by what has now become a much repeated factual account of a 35-mile trip between Steubenville, Ohio, and Moundsville, W. Va. According to witnesses who have testified before the committee, until 1963, when West Virginia made daylight saving time mandatory on a statewide basis, travelers over this 35-mile stretch at certain times in the past year passed through seven different time changes. Situations such as this make it

very difficult and very expensive for the transportation industry to publish intelligible timetables."

Public Law 89–387 states:

"It is the policy of the United States to promote the adoption and observance of uniform time within the standard time zones prescribed by the act."

Section 3(a) of the act provides:

*"During the period commencing at 2 o'clock antemeridian on the last Sunday of April of each year and ending at 2 o'clock antemeridian on the last Sunday of October of each year, the standard time of each zone established by the Act of March 19, 1918* (15 USC §§ 261–264), *as modified by the Act of March 4, 1921* (15 USC § 265), *shall be advanced one hour and such time as so advanced shall for the purposes of such Act of March 19, 1918, as so modified, be the standard time of such zone* during such period; except that *any State may by law exempt itself from the provisions of this subsection providing for the advancement of time, but only if such law provides that the entire State* (including all political subdivisions thereof) *shall observe the standard time otherwise applicable under such Act* of March 19, 1918, as so modified, during such period." (Emphasis supplied.)

Section 3(b) provides:

"It is hereby declared that it is the express intent of congress by this section *to supersede* any and all *laws of the States or political subdivisions thereof insofar as they may now or hereafter provide for advances in time or changeover dates different from those specified in this section."* (Emphasis supplied.)

In the light of the history of the act and its declared policy, the Federal law: (1) established a policy of promoting the adoption and observance

of uniform time within the standard time zones and (2) pre-empted the field as to daylight saving time within each zone unless a State exempted itself from the provision for the advancement of time. Change-over dates within a State or political subdivision are specifically spelled out in section 3(b) of the act. While I agree that the referendum petition could properly be filed and, hence, PA 1967, No 6, was no longer effective until vote of the electors on same, this did not affect the legal time which the State of Michigan had adopted by the act for the year 1967 because the last Sunday in April, the date fixed by the Federal act for time changeover, had passed while PA 1967, No 6, was in effect. PA 1967, No 6, is no longer in effect by virtue of the filing of the referendum petition and, consequently, I would hold that upon the next spring changeover date—April 28, 1968—the State would go on Eastern Daylight Saving Time, the final result to be determined on the referendum vote in the 1968 fall election. To permit the enactment of State legislation at any time within the period of advanced time for the purpose of effectuating compliance or effectuating exemption would obviously destroy the stated purpose of the Federal act to establish uniform dates for the commencing and ending of Daylight Saving Time. Exercise of State legislative power in this respect has been blocked by the Federal act's supersession provision.

Dethmers, C. J., did not sit.