Young, J.
I join and fully concur in the admirably concise majority opinion. I write separately to provide the rationale and analysis for my conclusion that 2000 PA 381 is exempt from the referendum power of art 2, § 9 of our 1963 state constitution and why I take exception to the constitutional exegesis offered by my dissenting colleagues.
I. THE QUESTION BEFORE THE COURT
There is no gainsaying that 2000 PA 381 has become the focus of a heated debate among various segments of Michigan’s citizens; Justice Cavanagh’s dissent is generous in providing his own extensive personal views on the public controversy surrounding 2000 PA 381. However important, this political issue— the merits or demerits of the underlying act — is not *369 before this Court. The sole question we are to decide in this case is a legal one: Is 2000 PA 381 subject to the referral process under the provisions of art 2, § 9? If it is, 2000 PA 381 will not become effective until the next general election — if a majority of the voters then approve it. Const 1963, art 2, § 9; MCL 168.477(2). If the stated limitation on the people’s referral power contained in art 2, § 9 applies, the act is not subject to the referendum process at all.
n. FACTUAL AND PROCEDURAL BACKGROUND
In December 2000, the Legislature enacted 2000 PA 381, MCL 28.421 et seq., which modifies the standards for the issuance of concealed weapons permits. The effective date of the law is July 1, 2001.
Intervening defendant is a group that filed with defendants Secretary of State and Board of State Canvassers a petition, signed by approximately 260,000 Michigan voters,[1] requesting a referendum on the new law. Although the Board of Canvassers initially, by a two-to-two vote, declined to certify the petition on the basis that the law may not be subject to referendum, on May 21, 2001, the board certified the petition. Approximately 230,000 valid signatures sup *370 ported the petition (80,000 more than the number required).[2]
On March 23, 2001, plaintiffs — two organizations that lobbied for the law and three individuals who want to apply for concealed weapons permits — filed a complaint for mandamus in the Court of Appeals, seeking to prevent the Board of State Canvassers from proceeding with the canvass of the petitions. Plaintiffs argued that 2000 PA 381 is not subject to referendum because it contains an appropriation to a state institution, the Department of State Police, and the Michigan Constitution provides that “[t]he power of referendum does not extend to acts making appropriations for state institutions . . . .” Const 1963, art 2, §9.
As stated, plaintiffs contended that two provisions in 2000 PA 381 make appropriations for a state institution within the meaning of art 9, § 2. The first, § 5v of the act, (1) creates a concealed weapon enforcement fund in the state treasury, (2) allows the state treasurer to receive money or other assets from any source for deposit into the fund and to direct the investment of the fund, (3) provides that money in the fund at the close of the fiscal year shall remain in the fund and not lapse to the general fund, and (4) directs the Department of State Police to expend money from the enforcement fund only to provide training to law enforcement personnel in connection *371 with the act.[3] The second, § 5w(l) of the act, provides that “[o]ne million dollars is appropriated from the general fund to the department of state police for the fiscal year ending September 30, 2001” for such activities as distributing free safety devices to the public and creating and maintaining a database of individuals applying for a concealed weapons license.[4]
Plaintiffs further argued that defendants Secretary of State and the Board of Canvassers had a threshold duty to determine whether the petition on its face meets the constitutional prerequisites for acceptance and canvassing, and that, until this determination was made, canvassing should cease.
*372 In an order dated April 9, 2001, the Court of Appeals granted People Who Care About Kids permission to intervene and accepted the amicus curiae brief of the Michigan Association of Chiefs of Police. The panel then dismissed plaintiffs’ complaint for mandamus, holding — on a ground not raised by the parties — that
the matter is not ripe for this Court’s consideration. The Board of State Canvassers has not completed its canvass of the referendum petitions. MCL 168.479.[5]
On plaintiffs’ application for leave to appeal, this Court remanded the matter to the Court of Appeals for plenary consideration of the complaint for mandamus.[6] 463 Mich 1009 (2001).
On remand, the Court of Appeals denied plaintiffs’ request for mandamus, holding that “2000 PA 381 is not an act making appropriations for state institutions as contemplated by Const 1963, art 2, § 9,” and that it therefore was subject to referendum. 246 Mich App 82; 630 NW2d 376 (2001).
*373 We granted plaintiffs’ application for leave to appeal from the decision of the Court of Appeals. 464 Mich 855 (2001).[7]
in. controlling rules of constitutional construction
Of preeminent importance in addressing the matter at hand is an understanding of the particularized rules of textual construction that apply to constitutional provisions. “Each provision of a State Constitution is the direct word of the people of the State, not that of the scriveners thereof,” Lockwood v Nims, 357 Mich 517, 565; 98 NW2d 753 (1959) (Black, J., concurring), and therefore “[w]e must never forget that it is a Constitution we are expounding,” id., quoting McCulloch v Maryland, 17 US (4 Wheat) 316, 407; 4 L Ed 579 (1819).
Our primary goal in construing a constitutional provision — in marked contrast to a statute or other texts — is to give effect to the intent of the people of the state of Michigan who ratified the constitution, by applying the rule of “common understanding.” Recently, in People v Bulger, 462 Mich 495, 507; 614 NW2d 103 (2000), we explained the rule of common understanding:
In construing our constitution, this Court’s object is to give effect to the intent of the people adopting it. . . . “Hence, the primary source for ascertaining its meaning is to examine its plain meaning as understood by its ratifiers at the time of its adoption.” [Citations omitted; emphasis supplied.]
*374 I agree with Justice Cavanagh’s reliance on Justice Cooley’s explanation of the rule of “common understanding”:
A constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. “For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed.” [Federated Publications, Inc v Michigan State Univ Bd of Trustees, 460 Mich 75, 85; 594 NW2d 491 (1999), quoting 1 Cooley, Constitutional Limitations (6th ed), p 81 (emphasis added).]
See also American Axle & Mfg, Inc v Hamtramck, 461 Mich 352, 362; 604 NW2d 330 (2000); State Highway Comm v Vanderkloot, 392 Mich 159, 179; 220 NW2d 416 (1974); Traverse City Sch Dist v Attorney General, 384 Mich 390, 405; 185 NW2d 9 (1971); Michigan Farm Bureau v. Secretary of State, 379 Mich 387, 391; 151 NW2d 797 (1967); Lockwood, supra at 569.
As expounded by Justice Cooley and this Court, the “common understanding” principle of construction is essentially a search for the original meaning attributed to the words of the constitution by those who ratified it. This rule of construction acknowledges the possibility that a provision of the constitution may rationally bear multiple meanings, but the rule is concerned with ascertaining and giving effect only to the construction, consistent with the language, that the *375 ratifiers intended. Thus, our task is not to impose on the constitutional text at issue here the meaning we as judges would prefer, or even the meaning the people of Michigan today would prefer, but to search for contextual clues about what meaning the people who ratified the text in 1963 gave to it.
Our analysis, of course, must begin with an examination of the precise language used in art 2, § 9 of our 1963 Constitution. See American Axle, supra at 362. Art 2, § 9 provides, in relevant part:
The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum. The power of initiative extends only to laws which the legislature may enact under this constitution. The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds and must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law was enacted. To invoke the initiative or referendum, petitions signed by a number of registered electors, not less than eight percent for initiative and five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.
No law as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a majority of the electors voting thereon at the next general election. [Emphasis supplied.]
As is apparent from the text of art 2, § 9, the people’s right of referral is expressly limited. The limitation relevant here is the first: There is no right of referral for “acts making appropriations for state institutions.” There is no dispute here that the Department of State Police is a “state institution” within the *376 meaning of art 2, § 9. Nor is there any dispute that 2000 PA 381 “allocated” one million dollars of public funds to the state police for responsibilities that the act requires the state police to perform. The contested issue is whether the million-dollar allocation made in 2000 PA 381 constitutes an “appropriation” within the meaning of art 2, § 9.
IV. APPLICATION
A. WAS THE COMMON UNDERSTANDING OF THE ARTICLE 2, SECTION 9 LIMITATION ON THE RIGHT OF REFERRAL AT THE TIME OF RATIFICATION DIFFERENT FROM THE PLAIN MEANING OF THE LANGUAGE?
The majority construes the language of art 2, § 9 in a plain and natural manner. Thus, it concludes that 2000 PA 381 is an act making an appropriation to a state institution and is thus exempt from the referral power. To read the hmiting language of art 2, § 9 in any other manner would incorporate into that constitutional provision a meaning that is not apparent on its face. Accordingly, unless we are able to determine that this provision had some other particularized meaning in the collective mind of the 1963 electorate, we must give the effect to the natural meaning of the language used in the constitution.
Justice Cavanagh asserts that the common understanding of art 2, § 9 is different from the plain meaning given to this constitutional provision by the majority. Those who suggest that the meaning to be given a provision of our constitution varies from a natural reading of the constitutional text bear the burden of providing the evidence that the ratifiers subscribed to such an alternative construction. Otherwise, the constitution becomes no more than a *377 Rorschach[8] exercise in which judges project and impose their personal views of what the constitution should have said.[9]
Interestingly, no one — not the dissents, the parties, or even the amici curiae — has attempted to provide a scintilla of historically based evidence that provides support for the belief that in 1963 the people of this state understood the limiting language of art 2, § 9 to mean something other than what it naturally and plainly says. The reason for this omission is simple: There is not much historical background on the provision to report in the first instance. Moreover, that which exists fails to demonstrate that the people attributed a meaning other than the construction the majority gives to art 2, § 9.
Within the limited time constraints occasioned by the exigencies of having to decide this case by the July 1, 2001, effective date of 2000 PA 381, we have searched for evidence that the common understanding is that proposed by Justice Cavanagh. We have found no such historical evidence in the record of the constitutional convention, at the time of our constitu *378 tion’s ratification, or in contemporaneous news articles that provide support for the dissent’s asserted “special” common understanding of art 2, § 9.
Indeed, one might expect that the framers of our 1963 Constitution — the participants of the constitutional convention that drafted the constitutional text that was eventually ratified — would have provided some gloss on or construction of the intended meaning of the art 2, § 9 limitation on the right of referral. In point of fact, the framers provided none.
Surprisingly, during the entire constitutional convention, excepting references to the convention’s successive procedural approvals of the provision at issue, the framers never discussed the substance of art 2, § 9.[10] Especially important, nothing in the convention record has any bearing on what the framers, much less the public, “commonly understood” about the limitation on the referral power created by the constitutional language selected — “acts making appropriations for state institutions.”
Particularly noteworthy in this regard is the “Address to the People” accompanying Const 1963, art 2, § 9. The address, officially approved by the members of the constitutional cdnvention, provides the text of each provision of the proposed constitution the people ratified in 1963 and a commentary, written in simple language, explaining the import of each provision and any changes the proposed constitution made to comparable provisions of the 1908 Constitution. That address was widely distributed to *379 the public before the ratification vote.[11] The address was intended as a vehicle to educate the public about the proposed constitution.
Significantly, in the “Address to the People” accompanying Const 1963, art 2, § 9, the framers advise the people that this provision constitutes only a “revision” of Const 1908, art 5, § 1, and that the revision “eliminatfes] much language of a purely statutory character.” 2 Official Record, p 3367. The address also notes that the revision “specifically reserves the initiative and referendum powers to the people [and] limits them as noted . . . .”[12] Id. (emphasis added). There is no further reference to the art 2, § 9 “limits” on the power of referral or any explanation regarding how those limitations were expected to function in practice.
Thus, the 1963 constitutional record provides no basis for concluding that the people were led to believe (or actually entertained the notion) that the art 2, § 9 limitation on the right of referral — “acts making appropriations for state institutions” — meant or was intended to mean anything other than what it *380 plainly says. Similarly, I have been unable to locate (and no one has provided to the Court) any contemporaneous news articles or other documents circulated in the public domain that suggest that the public in 1963 had a specific or “common” understanding of art 2, § 9 that diverged from the natural and plain meaning of its text.[13]
The absence of any evidence from the 1963 constitutional convention record or other contemporaneous articles in the public domain suggesting support for some kind of special “common understanding” about art 2, § 9 consistent with the dissents’ view (or any other) ought to be conclusive. In the absence of evidence on this point, this Court should accord the language in question its natural, plain meaning.
B. JUSTICE CAVANAGH’S ASSERTED “COMMON UNDERSTANDING” THAT “APPROPRIATIONS” MEANS “GENERAL APPROPRIATIONS” IS ALSO AT VARIANCE WITH THE STRUCTURE OP THE CONSTITUTION
Lacking any evidence that the citizens believed they were ratifying a provision that meant something quite *381 different from that of the plain language of art 2, § 9, Justice Cavanagh nevertheless presumes that this must have been the case. He is able to so conclude because he is convinced that the natural construction the majority gives to art 2, § 9 produces an “absurd result”:[14]
I am confident that the constitutional right of referendum, in this narrow context, should not be taken away by so transparent an artifice. Justice Cooley’s “great mass of the people” would, if asked, surely suppose that “acts making appropriations for state institutions,” which deny the people’s reserved power of referendum, are general appropriations bills containing substantial grants to state agencies. Those grants would have to ensure the viability of the agencies or, as the Court of Appeals put it, support the agencies’ “core functions.” 246 Mich App 82; 630 NW2d 376 (2001). The people of Michigan, I am certain, never intended to authorize the 2000 lame duck Legislature’s legerdemain. [Post at 411.][15]
I believe that Justice Cavanagh’s presumption is unfounded because (1) it is not grounded in an assessment of what the voters in 1963 understood art 2, § 9 to mean, and (2) it does not give sufficient weight or meaning to the expressly stated competing language and values embodied in our constitution or the differences between the power of initiative and referral.
*382 In this regard, it is important to consider the relationship between the constitutional power accorded to the Legislature, Const 1963, art 4, § 1, and the specific means chosen in the initiative and referendum provisions that check the power of the Legislature.[16] Without question, art 4, § 1 gives the Legislature plenary power to enact laws for the benefit of Michigan citizens. Equally clearly, art 2, § 9 provides a means for citizens directly to challenge legislative action or inaction. I believe that it is a matter of constitutional significance that the initiative power contains no limitation (save procedural requirements such as those concerning when the initiative process can be commenced and the number of people who must support it), but that the referendum power is expressly limited by two substantive restrictions — an exception to the power of referral for acts “making appropriations for state institutions,” and an exception for those acts enacted to “meet deficiencies in state funds.”[17]
Stated otherwise (leaving aside momentarily the question of what the people understood in 1963 the art 2, § 9 term “appropriations” meant), it appears unchallenged that “acts making appropriations” are always subject to nullification by initiative, but such acts are exempted from the referral power. Because *383 exercise of both the referral and initiative powers may result in the nullification of a law enacted by the Legislature, one may well ask: Why, when the people enacted two provisions that are clearly intended as checks on the constitutional power of the Legislature, would the people substantially limit their power of referral, but not their power of initiative? Based upon the structure of these provisions, the answer appears obvious that the people feared more the circumstance of preventing acts involving “appropriations” from becoming law (the referral power) than they feared a nullification vote on the very same bill after it became effective. Otherwise they would not have imposed an exception to their power of referral.
Justice Cavanagh asserts that the “appropriations” limitation on the people’s referral power could only have been intended to mean “general appropriations bills containing substantial grants to state agencies.” Post at 411. I question why that conclusion is justified, particularly given that even the dissent notes the framers’ drafting precision concerning matters involving the general budget. See post at 409-410. I wholeheartedly agree with Justice Cavanagh that the framers intended to improve and increase legislative accountability for legislative general budgeting processes and were very precise in their draftsmanship to accomplish this goal. See, e.g., Const 1963, art 4, § 31 (general appropriation bills, priority, statement of estimated revenue).[18] Justice Cavanagh assumes, *384 without providing support, that the people believed that only general appropriation acts were referenced in art 2, § 9.
appropriations- for the current fiscal year’s operation. Any bill requiring an appropriation to carry out its purpose shall be considered an appropriation bill. One of the general appropriation bills as passed by the legislature shall contain an itemized statement of estimated revenue by major source in each operating fund for the ensuing fiscal period, the total of which shall not be less than the total of all appropriations made from each fund in the general appropriation bills as passed.
Concerning art 4, § 31, in the Address to the People the framers advised:
This is a new section designed to accomplish two major purposes:
1. To focus legislative attention on the general appropriation bill or bills to the exclusion of any other appropriation bills, except those supplementing appropriations for the current year’s operation.
2. To require the legislature (as well as the governor by a subsequent provision) to set forth by major item its own best estimates of revenue.
The legislature frequently differs from executive estimates of revenue. It is proper to require that such differences as exist be specifically set forth for public understanding and future judgment as to the validity of each. [2 Official Record, p 3375.]
Thus, the people were specifically advised in 1963 that the focus of this provision was to ensure accountability for the making of the entire state budget. A reciprocal provision applicable to the Governor, art 5, § 18,[19] was also added in 1963. These *385 were entirely new provisions added to the 1963 Constitution whereas the language of art 2, § 9 was carried forward from the 1913 amendment to the 1908 Constitution. The 1908 Constitution had no provisions comparable to art 4, § 31 and art 5, § 18.
The point is that, contrary to Justice Cavanagh’s suggestion, none of these general budget provisions added in 1963 were connected by the framers to the older language of art 2, § 9. More important for our prnpose of discerning whether there was a “special” common understanding of art 2, § 9 as the dissent supposes, it is noteworthy that the framers clearly never communicated to the people that the new general budget provisions had any bearing on other legislative acts, such as 2000 PA 381, that merely made an appropriation of public funds to a state institution. In short, the general budget provisions of the 1963 Constitution do not appear to be related to other kinds of bills that simply “appropriate” for purposes other than the general budget process.[20]
*386 Most important to my conclusion that Justice Cavanagh is simply wrong in supposing that art 2, § 9 refers to general appropriation bills is the fact that art 4, § 31 provides a definition of “appropriation bill,”[21] and only this category of bills is tied to the annual budget process. Thus, had the framers intended that the art 2, § 9 “appropriations” limitation on the right of referral mean “a general appropriations bill” as urged by the dissent, then I believe that the framers would have done two things that they clearly did not do. First, I think the framers would have used in art 2, § 9 the art 4, § 31 definition of “appropriation bill.” Second, I believe the framers would have advised the public in the Address to the People of the relationship between the newly added general budget provisions (including the definition of appropriation bill) and the older language of art 2, § 9 limiting the power of referendum.
When it is so apparent throughout the 1963 Constitution that the framers sought to clarify the budget-related appropriations process, I think that the above-noted omissions underscore that the kind of “appropriations” referenced in art 2, § 9 have nothing to do with those referenced in art 4. Further, there is no evidence of which we are aware that in 1963 the people had a contrary “common understanding.”
Moreover, greater assurance that there was no “common understanding” contrary to the plain language of art 2, § 9 is derived from the controversy that culminated in this Court’s split decision in Todd v Hull, 288 Mich 521; 285 NW 46 (1939). In Todd, this *387 Court was called upon to determine whether 1939 PA 3[22] was properly given immediate effect pursuant to Const 1908, art 5, § 21,[23] notwithstanding that, by giving the act immediate effect, the Legislature had encroached upon Const 1908, art 5, § 1 (the precursor of Const 1963, art 2, § 9). Four members of the Todd Court agreed, with little explanation, with the plaintiffs’ assertion that 1939 PA 3 was not in the category of “acts making appropriations” within the meaning of art 5, § 21. However, four other justices observed that
[t]here is no question but that the act makes an appropriation. An act making an appropriation as used in the Constitution is a legislative act which sets apart or assigns to a particular purpose or use a sum of money out of what may *388 be in the treasury of the State for a specific purpose and objects, — an act authorizing the expenditure of public funds for a public purpose. [Todd at 531.]
Regarding the referral question, these four justices additionally opined that
[t]he claim that plaintiffs are entitled to a referendum is effectually disposed of by the language of the Constitution itself because if the legislature had a right to give the act in question immediate effect, then it negatived the idea of a referendum. [Todd, supra at 535.]
The significance of Todd is not that it conclusively construed the same language at issue in this case. The fact is, Todd — a split decision — has no preceden-tial value. Todd is nevertheless highly relevant because it involves a claim, similar to the one made here, that the Legislature’s inclusion of an appropriation in 1939 PA 3 was a “mere subterfuge,” Todd at 531, to place it within the category of acts that could be given immediate effect and thus be immune to referendum.
Todd demonstrates that the people were aware in 1963 that the Legislature had exercised what it believed to be its appropriation prerogative in such a fashion as to diminish the people’s right of referral. Notwithstanding, the people did not seek to change the constitutional referral language to preclude the Legislature from capriciously exercising its po wer of appropriation.
V. CONCLUSION
Determining the people’s “common understanding” of a relatively obscure constitutional provision rati- *389 fled nearly forty years ago is admittedly a challenging deductive enterprise — one that must be grounded in the available evidence. Above all, it is not a psychic exercise. On the basis of the evidence we have independently sought, I conclude that there is no reliable evidence that the people commonly understood anything other than what art 2, § 9 plainly says: that the people’s power of referral is precluded concerning any act that makes an appropriation for a state institution. Accordingly, 2000 PA 381 falls within the category of “acts making appropriations for state institutions” and is thus not amenable to the people’s right of referral under art 2, § 9.
The majority’s decision today will undoubtedly disappoint those who passionately believe that 2000 PA 381 represents bad public policy. While it will be of no consolation, it bears restating that the serious underlying political question is not before the Court.
In the current charged political environment, the dissent makes an emotionally appealing argument: Why not just let the people decide? Simply answered, the people’s ability to decide by the referendum process is not infinite; rather, it is circumscribed by the limitations placed in the Michigan Constitution. While perhaps less satisfying to those who oppose 2000 PA 381, our answer is that the people are still free to directly challenge the propriety of the legislation by initiative. Const 1963, art 2, § 9; MCL 168.471, 168.472. Additionally, if the people believe that the Legislature has abused its powers by capriciously precluding their power of referral, the traditional means of voter sanction remain recall and the ballot box. However, the limitations imposed in art 2, § 9 on the people’s *390 right of referral preclude that they do so by means of referendum.
Finally, while it may be attractive to some, I believe that the dissenter’s approach is not only at odds with the constitution, but destroys the Legislature’s direct accountability to the people for its acts by interposing the judiciary as an arbiter of essentially political questions that are fundamentally legislative in character. Consider Justice Cavanagh’s tests of what he believes constitutes “appropriations” that do preclude referrals under art 2, § 9: (1) grants that “ensure the viability of [state] agencies”; or (2) grants that “support the agencies’ ‘core functions.’ ” (Post at 411.) Exactly how large an “appropriation” constitutes one sufficient to ensure the “viability” of a state agency or, for that matter, its “core function”? What is a state agency’s “core” function, what constitutes its “viability,” and who gets to decide these questions — the Board of Canvassers, the Secretary of State, the courts? The dissenters are eager to have the courts decide these questions. Perhaps there are members of the public who believe that the courts are competent to address these issues. I submit that these are Delphic questions that neither a judge nor the judicial system itself is best equipped to answer. More to the point, the tests the dissenters urge to assess whether an act making an appropriation is nonetheless amenable to referral despite the express constitutional limitation are simply ones made up from whole cloth and which have no basis in the text of our constitution. The judiciary is not authorized to create ways of evading the terms of our constitution; nor should the courts manufacture tests that amount to no more than providing a means of promoting sitting judges’ personal prefer- *391 enees to accomplish such goals. Neither is a judicial function, and the public should never be confused on this issue. Our courts must refrain from engaging in such endeavors because they are beyond our constitutional authority and competence.

 According to a letter written by Christopher Thomas, Director of Elections for the Department of State, an effective referendum petition requires 151,136 valid signatures (comprising five percent of voters in the last gubernatorial election). Approximately 260,000 signatures appear on the petition filed by defendants. Once the Board of Elections has declared the sufficiency of a referendum petition, the effectiveness of the law that is the subject of the petition is suspended until a vote at the next general election, November 2002 in this case. Const 1963, art 2, § 9; MCL 168.477(2).

 On May 16, 2001, intervening defendant filed its own mandamus action, asking the Court of Appeals to require the Board of Canvassers to certify the petition. However, the Court of Appeals opinion in the instant case was issued on the same day, just before the filing of intervening defendant’s complaint. After the Board of Canvassers met for a second time and voted to certify the petition, the parties informed the Court of Appeals that the second mandamus action was moot.

 MCL 28.425V.

 MCL 28.425w(l) provides:
One million dollars is appropriated from the general fund to the department of state police for the fiscal year ending September 30, 2001 for all of the following:
(a) Distributing trigger locks or other safety devices for firearms to the public free of charge.
(b) Providing concealed pistol application kits to county sheriffs, local police agencies, and county clerks for distribution under section 5.
(c) The fingerprint analysis and comparison reports required under section 5b(ll).
(d) Photographs required under section 5c.
(e) Creating and maintaining the database required under section 5e.
(f) Creating and maintaining a database of firearms that have been reported lost or stolen. . . .
(g) Grants to county concealed weapon licensing boards for expenditure only to implement this act.
(h) Training under section 5v(4).
(i) Creating and distributing the reporting forms required under section 5m.
0) A public safety campaign regarding the requirements of this act.

 MCL 168.479 provides:
[a]ny person or persons, feeling themselves aggrieved by any determination made by said board, may have such determination reviewed by mandamus, certiorari, or other appropriate remedy in the supreme court.

 We stated in our remand order that
[t]his controversy is ripe for review because it is not dependent upon the Board of Canvassers’ counting or consideration of the petitions but rather involves a threshold determination whether the petitions on their face meet the constitutional prerequisites for acceptance. ... All of the information necessary to resolve this controversy, i.e., whether 2000 PA 381 constitutes a law which is excepted from the referendum process under Const 1963, art 2, § 9, is presently available.

 We indicated in our grant order that the only issue for our consideration was “whether 2000 PA 381 is an act making an appropriation for a state institution for the purposes of Const 1963, art 2, § 9.”

 A Rorschach test is a personality and intelligence test that requires a subject to “interpret” inkblots. Webster’s New Collegiate Dictionary, 1977, p 1006.

 The difference between my approach and that of the dissents is that I believe I have an obligation to establish from available historical evidence whether the “common understanding” diverged from the plain meaning of the language in the constitution. Because the dissents offer no such proofs, and presumably believe them to be unnecessary, it appears that the dissents believe that they can “intuit” the common understanding they prefer. Given their intuited conclusion about the people’s understanding, the dissents ignore the art 2, § 9 limitation on the power of referral. Justice Cavanagh’s dissent concludes that the limitation, if given effect, could not have been intended by the people because it causes a “constitutional invalidity.” Post at 411. This is pure tautological reasoning. A constitutional provision that contains its own limitation cannot be “invalidated” when one gives the limitation its natural import.

 See 1 Official Record, Constitutional Convention 1961, p 758; 2 Official Record, Constitutional Convention 1961, pp 2390-2392, 2418, 2779, 2927-2928.

 Because the “Address to the People,” or “Convention Comments,” constitutes an authoritative description of what the framers thought the proposed constitution provided, this document is a valuable tool in determining whether a possible “common understanding” diverges from the plain meaning of the actual words of our constitution. See Regents of the Univ of Mich v Michigan, 395 Mich 52, 60; 235 NW2d 1 (1975) (“[t]he reliability of the ‘Address to the People’ . . . lies in the fact that it was approved by the general convention ... as an explanation of the proposed constitution. The Address’ also was widely disseminated prior to adoption of the constitution by vote of the people”).

 Equally of interest is the actual language of the two limitations of art 2, § 9 on the power of referral. The first precludes referrals concerning “acts making appropriations to state institutions” while the second precludes referrals concerning acts addressing “deficiencies in state funds.” Other than the meaning suggested by the words of the clause itself, we have no greater understanding of what the framers, much less the people, understood the second limitation to mean than we do of the first.

 While in 1963 the question of government by plebiscite — direct action by the citizens through initiative and referendum as opposed to indirect action through their elected representatives — was a commonplace fact of American political life, in 1913, this was still a startlingly radical proposition and one rarely embodied in state constitutions of the era. In 1913, only a dozen or so states recognized a popular right of referendum and initiative. Detroit Free Press, March 22, 1913.
The public record concerning the 1913 amendment that incorporated the precursor of art 2, § 9 into the 1908 Constitution also fails to establish that the people then understood the “acts making appropriations” limitation to mean something other than what the language plainly suggests. We have been unable to locate from any source the actual 1913 amendment ballot language approved. Neither the Detroit Free Press nor The Detroit News Tribune did more than respectively advocate the rejection or adoption of the amendment. See, e.g., Detroit Free Press, March 22, 1913; The Detroit News Tribune, March 18, 1913. We have found no historical basis even for a “vicarious” common understanding of the kind asserted by Justice Cavanagh grounded in the ratification of the 1913 amendment.

 In a different context in which this Court was construing a statute, we rejected the “absurd result” mode of construction. People v McIntire, 461 Mich 147, 155-160; 599 NW2d 102 (1999).

 Justice Cavanagh also suggests that acts making grants that “ensure the viability of [state] agencies” or grants that “support the agencies’ ‘core’ functions” would also preclude a referendum. Of course, Const 1963, art 2, § 9 contains no textual support for either of the two tests.

 “The legislative power of the State of Michigan is vested in a senate and a house of representatives.” Const 1963, art 4, § 1.

 As noted, the current provision carries forward the language of Const 1908, art 5, § 1, that the referendum power does not extend to “acts making appropriations for state institutions and to meet deficiencies in state funds.” Art 2, § 9 uses the disjunctive “or” between the two categories of nonreferable items, as opposed to the conjunctive “and” in the art 5, § 1 version of the provision in the 1908 Constitution. We need not speculate about the possible meaning of this word change, because our only concern in this matter is with respect to the first limitation category.

 Const 1963, art 4, § 31 provides:
The general appropriation bills for the succeeding fiscal period covering items set forth in the budget shall be passed or rejected in either house of the legislature before that house passes any appropriation bill for items not in the budget except bills supplementing

 Const 1963, art 5, § 18 provides:
The governor shall submit to the legislature at a time fixed by law, a budget for the ensuing fiscal period setting forth in detail, for all operating funds, the proposed expenditures and estimated *385 revenue of the state. Proposed expenditures from any fund shall not exceed the estimated revenue thereof. On the same date, the governor shall submit to the legislature general appropriation bills to embody the proposed expenditures and any necessary bill or bills to provide new or additional revenues to meet proposed expenditures. The amount of any surplus created or deficit incurred in any fund during the last preceding fiscal period shall be entered as an item in the budget and in one of the appropriation bills. The governor may submit amendments to appropriation bills to be offered in either house during consideration of the bill by that house, and shall submit bills to meet deficiencies in current appropriations.

 The constitution also explicitly recognizes a nonbudgetary form of appropriation acts, those that appropriate public money for local or private purposes. See art 4, § 30. The point is, the constitution does not purport, as intimated by the dissent, to limit or define legislation that makes an appropriation as only those acts that concern general appropriations.

 “Any bill requiring an appropriation to carry out its purpose shall be considered an appropriation bill.” Art 4, § 31.

 1939 PA 3 abolished the Michigan Public Utilities Commission, created the Michigan Public Service Commission, and appropriated $10,000 from the general fund for the purpose of setting up the mpsc.

 That provision of our 1908 Constitution — which contained language identical to that appearing in the 1908 version of art 2, § 9 — provided that
the legislature may give immediate effect to acts making appropriations and acts immediately necessary for the preservation of the public peace, health or safety .... [Const 1908, art 5, § 21 (emphasis supplied).]
Compare this “immediate effect” provision language with that of Const 1908, art 5, § 1 (the predecessor to Const 1963, art 2, § 9):
[T]he people reserve to themselves the power to . . . approve or reject at the polls any act passed by the legislature, except acts making appropriations for state institutions and to meet deficiencies in state funds.
* • ** *
The second power reserved to the people is the referendum. No act passed by the legislature shall go into effect until 90 days after the final adjournment of the session of the legislature which passed such act, except such acts making appropriations and such acts immediately necessary for the preservation of the public peace, health or safety, as have been given immediate effect by action of the legislature. [Emphasis supplied.]