*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

MOTHERING JUSTICE, MICHIGAN ONE FAIR
WAGE, MICHIGAN TIME TO CARE,
RESTAURANT OPPORTUNITIES CENTER OF
MICHIGAN, JAMES HAWK, and TIA MARIE
SANDERS,

       Plaintiffs-Appellees,

v

ATTORNEY GENERAL,

       Defendant-Appellee,

and

STATE OF MICHIGAN,

       Defendant-Appellant.

FOR PUBLICATION
January 26, 2023
9:05 a.m.

No.   362271
Court of Claims
LC No.   21-000095-MM

---

Before:  M. J. KELLY, P.J., and MURRAY and RIORDAN, JJ.

MURRAY, J.

The issue we must decide in this expedited appeal is whether two statutes that were enacted by the Legislature under the initiative process outlined in the state Constitution, 1963 Mich Const, art 2, § 9, can be amended during the same legislative session in which they were enacted.  The Court of Claims held that the Legislature was prohibited from doing so, and thus ruled that 2018 PA 368 and 369 were unconstitutional.  Because the trial court's conclusions are not supported by either the text or intent of art 2, § 9, we reverse the Court of Claims' order and remand for entry of an order granting the state's motion for summary disposition.

Before turning to our decision, we reluctantly add a disclaimer to emphasize a point we hope is obvious, but we know is often lost by those who focus solely on the result of a court decision, rather than the analysis within that decision: the underlying policies set forth in the public acts at issue are completely irrelevant to our decision.  Whether "the underlying subject matter is taxes, abortions, sentencing of criminals, you name whatever that social issue is, is not relevant to this matter."  *Frey v Dir of Dept of Social Services*, 162 Mich App 586, 589 n1; 413 NW2d 54

-1-

(1987), aff'd *Frey v Dep't of Mgt & Budget*, 429 Mich 315; 414 NW2d 873 (1987). See also *Regents of the Univ of Michigan v Michigan*, 395 Mich 52, 76; 235 NW2d 1 (1975) ("[T]he Court is not called upon to give its opinion as to whether the legislation in question is good public policy and the best part of wisdom for the Legislature and the universities to follow. We are asked only whether the legislative conditions invade the constitutional jurisdiction of the universities. Therefore, our conclusions based on the Constitution and the foregoing precedents and our analysis of the lessons they teach can be seen only in that perspective."). Instead, because our judicial task is to uphold the Constitution as adopted by the people, our focus is exclusively on the constitutionality of the procedure used by the Legislature to amend these acts.

## I. BACKGROUND

The procedural background to the legislation was set forth by Justice (now Chief Justice) CLEMENT in her concurring opinion in *In re House of Representatives Request for Advisory Opinion Regarding Constitutionality of 2018 PA 368 & 369*, 505 Mich 884, 884-885; 936 NW2d 241 (2019) (CLEMENT, J., concurring):

> The Michigan Constitution allows Michigan voters to exercise various forms of direct democracy, one of which is to initiate legislation via petitions signed by a requisite number of voters. See Const 1963, art 2, § 9. Groups known as 'Michigan One Fair Wage' and 'MI Time to Care' sponsored, respectively, proposals known as the 'Improved Workforce Opportunity Wage Act' and the 'Earned Sick Time Act.' Pursuant to MCL 168.473, they filed those petitions with the Secretary of State in the summer of 2018. The Secretary of State then notified the Board of State Canvassers, MCL 168.475(1), which canvassed the petitions to determine whether an adequate number of signatures was submitted, MCL 168.476(1). The Board ultimately certified both petitions as sufficient, MCL 168.477(1), and, pursuant to Const 1963, art 2, § 9, the proposals were submitted to the legislature. This constitutional provision required that the proposals were to 'be either enacted or rejected by the legislature without change or amendment within 40 session days from the time such petition [was] received by the legislature,' with enactment not 'subject to the veto power of the governor.' The legislature ultimately adopted both 'without change or amendment' on September 5, 2018. 2018 PAs 337 and 338. Enacting them meant that they were not 'submit[ted] . . . to the people for approval or rejection at the next general election.' Const 1963, art 2, § 9. Had they been submitted to the people and adopted, they would only have been amendable with a three-fourths majority in the legislature. *Id.*

> After the 2018 elections, the legislature turned its attention to these policy areas once again. Although Attorney General Frank Kelley had, several decades ago, opined that 'the legislature enacting an initiative petition proposal cannot amend the law so enacted at the same legislative session,' OAG, 1963-1964, No. 4,303, p 309, at 311 (March 6, 1964), a member of the Michigan Senate asked for an opinion on that issue and Attorney General Bill Schuette issued a new opinion which superseded the prior opinion and concluded that the legislature *could* enact amendments to an initiated law during the same session at which the initiated law

was itself enacted. See OAG, 2017-2018, No. 7306, p. —— (December 3, 2018). The Legislature thereafter did adopt certain amendments to these proposals with a simple majority, which—as ordinary legislation—the Governor signed into law. See 2018 PA 368 and 369. Because neither law contained a more specific effective date, both took effect on the 91st day after the 99th legislature adjourned *sine die*. Const 1963, art 4, § 27; *Frey v Dep't of Mgt & Budget*, 429 Mich [at 340]. The Legislature adjourned on December 28, 2018, see 2018 HCR 29, so the effective date of 2018 PA 368 and 369 was March 29, 2019. [footnotes omitted].

In 2019, the Legislature sought an advisory opinion from the Supreme Court regarding the constitutionality of 2018 PA 368 and 2018 PA 369, but that Court denied the requests because it was "not persuaded that granting the requests would be an appropriate exercise of the Court's discretion." *In re House of Representatives Request for Advisory Opinion Regarding Constitutionality of 2018 PA 368 & 369*, 505 Mich 884.

Two years later, plaintiffs filed a complaint (which was later amended) asserting that 2018 PA 368 and 2018 PA 369 were unconstitutional under Const 1963, art 2, § 9, and that 2018 PA 337 and 2018 PA 338 remained in effect. After several procedural matters were addressed,[1] each party moved for summary disposition under MCR 2.116(C)(10). Plaintiffs and the Attorney General moved for summary disposition on the basis that Const 1963, art 2, § 9 did not permit the Legislature to adopt a proposed initiative and amend it within the same legislative session[2] because allowing it to do so would be contrary to the common understanding of the Michigan Constitution. The Attorney General further argued that if 2018 PA 368 and 2018 PA 369 were declared unconstitutional, 2018 PA 337 and 2018 PA 338 would be in full effect. The State sought judgment in its favor on the basis that the Constitution did not preclude the Legislature from amending a voter-initiated law in the same session in which the Legislature approved it.

The Court of Claims issued a thorough written opinion. In its opinion, the court recognized that Const 1963, art 2, § 9 outlined three options that the Legislature could take during the first 40 days after receiving an initiative petition: it could reject the petition, it could reject the petition and propose a different law, or it could enact the law without change. The court opined that "[a]rticle 2, § 9 does not provide the Legislature with any other options during (or after) the 40-day period, including the option to significantly amend the proposed law after adopting it." Because the people gave the Legislature the option to propose an alternative, the court ruled that the Legislature could not simply adopt the legislation and amend it after it was enacted.

Part of the court's reasoning was premised upon two effects that the court perceived would occur if the Legislature were permitted to adopt and amend initiative laws. First, as to the right of the people to a referendum, the court concluded that "the use of the words 'such' and 'it' [within art 2, § 9] indicates that the People intended that the *exact law* will be subject to the referendum,"

---

[1] The trial court denied the motion to intervene by the Michigan House of Representatives and Senate, but it did grant those entities the opportunity to participate as amicus curiae.

[2] This procedure is referred to by the parties and amicus curiae as, not surprisingly, "adopt and amend."

and therefore the initiated law could not be amended until after the referendum period had passed. Second, it noted that, once passed by voters, an initiated law could only be repealed by another vote of the people or by a supermajority vote of ¾ of the Legislature. The court opined that if the Legislature could adopt and significantly amend a voter-initiated law in the same legislative session, it would render the supermajority provision meaningless because a Legislature that opposed the initiative would only need to adopt it and then amend or repeal it by a simple majority. Permitting it to do so would effectively eliminate the supermajority provision given to laws passed by the people through the initiative process.

The trial court also determined that Const 1963, art 4, § 1, which granted the Legislature full legislative authority with only two limitations, was limited by Const 1963, art 2, § 9, which outlined and constrained the Legislature's power regarding initiatives and did not allow the Legislature to immediately amend an initiative that it adopted. The court concluded that Const 1963, art 2, § 9 prohibited the Legislature from taking an action outside of the options that the people provided in Const 1963, art 2, § 9.

Taking these legal conclusions and applying them to 2018 PA 368 and 2018 PA 369, the court held that the substantive amendments to these voter-initiated acts effectively thwarted the intent of the people by denying them the opportunity to vote on whether they preferred the voter-initiated proposal or the Legislature's modified proposal. As a result, the court ruled that 2018 PA 368 and 2018 PA 369 were void because they unconstitutionally amended the initiatives that the Legislature had adopted, that 2018 PA 337 and 2018 PA 338 remained in effect, and rendered judgment in favor of plaintiffs.[3]

## II. ANALYSIS

## A. STANDARDS OF REVIEW

The resolution of this appeal involves determining the meaning of constitutional provisions and applying those legal conclusions to the undisputed facts. We review de novo these preserved questions of constitutional law, *League of Women Voters of Mich v Secretary of State*, 508 Mich 520, 534; 975 NW2d 840 (2022); *Mich Coalition of State Employee Unions v Michigan*, 498 Mich 312, 322; 870 NW2d 275 (2015), as we do with a trial court's decision on a motion for summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). A party is entitled to summary disposition if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment . . . as a matter of law." MCR 2.116(C)(10). Because the parties do not dispute the material facts, the only question is which party is entitled to judgment as a matter of law.

## B. GOVERNING LEGAL PRINCIPLES

---

[3] Following the State's motion to stay, the court expressed "concerns regarding the ability of employers and the relevant state agencies to immediately accommodate the changes required by 2018 PA 337 and 2018 PA 338." It therefore stayed the effect of its decision for 205 days, or until February 20, 2023.

"Our primary goal in construing a constitutional provision is to give effect to the intent of the people of the state of Michigan who ratified the Constitution, by applying the rule of common understanding." *Mich Coalition of State Employee Unions*, 498 Mich at 323 (quotation marks omitted). Under the rule of common understanding, this Court "determin[es] the plain meaning of the text as it was understood at the time of ratification." *Id*. As a result, our primary focus is on the language of the Constitution itself and the common meaning of the words at the time of ratification, as those words were what the people considered when adopting this state's foundational document. *Citizens Protecting Michigan's Constitution v Secretary of State*, 503 Mich 42, 61 & n 26; 921 NW2d 247 (2018) (Courts primary focus in determining meaning of constitutional provision is what the common meaning of the text was at the time of ratification); *Wayne County v Hathcock*, 471 Mich 445, 468-469; 684 NW2d 765 (2004) ("This Court typically discerns the common understanding of constitutional text by applying each term's plain meaning at the time of ratification."). To help discern the ratifiers' intent, this Court will also look to the circumstances leading to the adoption of the provision and what purpose the people sought to accomplish. *Mich Coalition of State Employee Unions*, 498 Mich at 323 (citation omitted). The most powerful tool for determining the intent of the framers is the constitutional convention debates. *House Speaker v Governor*, 443 Mich 560, 580-581; 506 NW2d 190 (1993) ("[T]he most instructive tool for discerning the circumstances surrounding the adoption of the provision is the floor debates in the Constitutional Convention record."). See also *Citizens Protecting Michigan's Constitution*, 503 Mich at 61 n 26.

Const 1963, art 2, § 9 provides as follows:

The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum. The power of initiative extends only to laws which the legislature may enact under this constitution. The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds and must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law was enacted. To invoke the initiative or referendum, petitions signed by a number of registered electors, not less than eight percent for initiative and five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.

No law as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a majority of the electors voting thereon at the next general election.

Any law proposed by initiative petition shall be either enacted or rejected by the legislature without change or amendment within 40 session days from the time such petition is received by the legislature. If any law proposed by such petition shall be enacted by the legislature it shall be subject to referendum, as hereinafter provided.

If the law so proposed is not enacted by the legislature within the 40 days, the state officer authorized by law shall submit such proposed law to the people for

approval or rejection at the next general election.  The legislature may reject any measure so proposed by initiative petition and propose a different measure upon the same subject by a yea and nay vote upon separate roll calls, and in such event both measures shall be submitted by such state officer to the electors for approval or rejection at the next general election.

Any law submitted to the people by either initiative or referendum petition and approved by a majority of the votes cast thereon at any election shall take effect 10 days after the date of the official declaration of the vote.  No law initiated or adopted by the people shall be subject to the veto power of the governor, and no law adopted by the people at the polls under the initiative provisions of this section shall be amended or repealed, except by a vote of the electors unless otherwise provided in the initiative measure or by three-fourths of the members elected to and serving in each house of the legislature.  Laws approved by the people under the referendum provision of this section may be amended by the legislature at any subsequent session thereof.  If two or more measures approved by the electors at the same election conflict, that receiving the highest affirmative vote shall prevail.

The legislature shall implement the provisions of this section.

Before turning to a discussion of the particulars of art 2, § 9, we recognize a few over-arching principles that guide our decision.  First, it is critically important to remember that, "[e]xcept to the extent limited or abrogated by article IV, section 6 or article V, section 2, the legislative power of the State of Michigan is vested in a senate and a house of representatives." Const 1963, art 4, § 1.  Unlike the federal Constitution, which contains specific and limited delegations of power to Congress, under our state Constitution the Legislature has all legislative power unless specifically limited by the state or federal Constitutions. *Mich Coalition of State Employee Unions*, 498 Mich at 331-332 (citations omitted).  In other words, the Legislature does not need express permission from the Constitution to act; instead, it has the power to legislate on all matters that are not otherwise prohibited by the Constitution:

A different rule of construction applies to the Constitution of the United States than to the Constitution of a State.  The Federal government is one of delegated powers, and all powers not delegated are reserved to the States or to the people.  When the validity of an act of Congress is challenged as unconstitutional, it is necessary to determine whether the power to enact it has been expressly or impliedly delegated to Congress.  The legislative power, under the Constitution of the state, is as broad, comprehensive, absolute, and unlimited as that of the Parliament of England, subject only to the Constitution of the United States and the restraints and limitations imposed by the people upon such power by the Constitution of the state itself. [*Young v Ann Arbor*, 267 Mich 241, 243; 255 NW 579 (1934)].

See also *Attorney General v Montgomery*, 275 Mich 504, 538; 267 NW 550 (1936) ("The legislative authority of the state can do anything which it is not prohibited from doing by the people through the Constitution of the state or of the United States."); *In re Brewster Street Housing Site*, 291 Mich 313, 333; 289 NW 493 (1939) (Unlike the federal Constitution, the state Constitution

"is not a grant of power to the legislature, but is a limitation upon its powers") (citation omitted), and *Taxpayers of Mich Against Casinos v Michigan*, 471 Mich 306, 327-328; 685 NW2d 221 (2004).

Second, and relatedly, it has been recognized that under Const 1963, art 2, § 9, "[d]irect democracy in Michigan is a series of powers that the people have reserved to themselves *from* the legislature." *League of Women Voters*, 508 Mich at 536. The initiative provision of Const 1963, art 2, § 9 is one of the constitutional provisions that expressly limits the authority of the Legislature. *Id.* (citation omitted). Third, powers that the people have expressly reserved should "be saved if possible as against conceivable if not likely evasion or parry by the legislature," *Mich Farm Bureau v Hare*, 379 Mich 387, 393; 151 NW2d 797 (1967), and "[c]onstitutional and statutory initiative and referendum provisions should be liberally construed to effectuate their purposes, to facilitate rather than hamper the exercise by the people of these reserved rights." *Newsome v Bd of State Canvassers*, 69 Mich App 725, 729; 245 NW2d 374 (1976).

## C. ART 2, § 9

Art 2, § 9 contains two direct[4] democracy provisions: the right of the people to initiate their own law (the initiative), and to approve or reject a law enacted through the normal republican governmental process (a referendum). See *League of Women Voters*, 508 Mich at 536. Although each provision is contained within art 2, § 9, the procedures governing their implementation are not entirely the same.

### 1. INITIATIVES

With regard to initiative laws, art 2, § 9 provides that the "power of initiative extends only to laws which the legislature may enact under this constitution." Once a proper initiative petition is submitted to the Legislature by the Secretary of State, the Legislature has 40 sessions days from submission to either enact the proposed law as is or reject it:

> Any law proposed by initiative petition shall be either enacted or rejected by the legislature without change or amendment within 40 session days from the time such petition is received by the legislature. [art 2, § 9].

"If any law proposed by such petition shall be enacted by the legislature it shall be subject to referendum, as hereinafter provided." *Id.*

---

[4] Although some courts have referred to the initiative and referendum as "direct" democracy provisions, the statutory initiative process is more properly recognized as an "indirect" democracy provision since the initiated proposal is first submitted to the Legislature for its consideration before being potentially submitted for a vote by the people. See *Wolverine Golf Club v Secretary of State*, 24 Mich App 711, 716-717; 180 NW2d 820 (1970), aff'd 384 Mich 461 (1971). The initiative for constitutional amendments is an example of direct democracy, as once the petition is certified, the proposal is submitted directly to the voters. *Id.* at 716.

If the Legislature chooses not to enact the proposed law, that law is submitted to the voters at the next general election, as can any alternative proposal approved by the Legislature:

> If the law so proposed is not enacted by the legislature within the 40 days, the state officer authorized by law shall submit such proposed law to the people for approval or rejection at the next general election. The legislature may reject any measure so proposed by initiative petition and propose a different measure upon the same subject by a yea and nay vote upon separate roll calls, and in such event both measures shall be submitted by such state officer to the electors for approval or rejection at the next general election. [*Id*.]

If the initiated proposal receives voter approval, then the initiated law is not "subject to the veto power of the governor," and cannot "be amended or repealed, except by a vote of the electors unless otherwise provided in the initiative measure or by ¾ of the members elected to and serving in each house of the legislature." *Id*.

## 2. REFERENDUMS

As noted, art 2, § 9 also contains the right of the people to either accept or reject a law that is enacted through the legislative process, called the referendum. Once a referendum to a statute has been properly filed, the statute's commands are suspended until the vote of the people at the next general election:

> No law as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a majority of the electors voting thereon at the next general election. [*Id*.]

If a statute is rejected through a referendum, it is no longer a law. A referendum must be invoked "within 90 days following the final adjournment of the legislative session at which the law was enacted." *Id*. If a statute is approved by referendum, it receives certain protections, including that it cannot be amended during the same legislative session in which it was adopted:

> Laws approved by the people under the referendum provision of this section may be amended by the legislature at any subsequent session thereof. [*Id*.]

A law adopted by the people through a referendum is also not subject to a governor's veto. *Id*.

## 3. 2018 PUBLIC ACTS 368, 369

On July 30, 2018, the Secretary of State submitted to the Legislature under art 2, § 9, an initiative petition from the Michigan Time to Care ballot proposal committee. On August 27, 2018, the Secretary of State submitted to the Legislature, also under art 2, § 9, an initiative petition from the Michigan One Fair Wage ballot proposal committee. Both proposals had to be acted upon by the Legislature within 40 session days of their submission. It is undisputed that they were, as the Michigan One Fair Wage proposal was enacted, as submitted, as PA 337 of 2018, while the Michigan Time to Care proposal was enacted, as submitted, as PA 338 of 2018. As a result, the

Legislature's enactment in full of both initiative petitions within 40 session days of their submission complied with its duty to act under art 2, § 9.[5] No party disputes that conclusion.

The disputed question, of course, is whether the Legislature could amend those public acts after the 40-day period expired, but prior to the end of the legislative session. As has been said before, "[t]his issue is not without difficulty." *Mich Farm Bureau*, 379 Mich at 393. However, for several reasons we conclude that the Legislature acted within its constitutional authority when it amended PAs 337 and 338. First, focusing on the common understanding of the words employed within art 2, § 9, the commands placed on the Legislature were satisfied by adoption of the initiative proposals, in full, within 40 session days of their submission. Second, although art 2, § 9 contains a provision precluding the Legislature from amending certain laws until the next legislative session, *that restriction is specifically and only for laws subject to referendum*. That same restriction, which the trial court essentially imposed upon the Legislature for initiatives as well, was not placed by the people on initiative laws. Third, the constitutional convention record shows both that the framers envisioned the Legislature taking "full control" of legislation by adopting it, and specifically rejected making the Legislature wait until the next legislative session to amend voter-approved initiated laws. Fourth, in the absence of any restrictions, the Legislature is empowered to amend any law, and our case law states that an initiated law enacted by the Legislature is on the same footing as any other law passed by the Legislature. Fifth, construing art 2, § 9 as not prohibiting the "adopt and amend" procedure does not interfere with any other constitutional provision, and particularly the right to a referendum on the initially adopted laws. We explain our reasoning in more detail below.

### a. THE COMMON UNDERSTANDING

The plain text of art 2, § 9 states that the Legislature must act within 40 session days of receiving an initiative petition and provides that the Legislature has only three options it can take during those 40 session days. Specifically, the Legislature can (1) adopt the proposed law in its entirety, (2) reject the proposed law, or (3) reject the proposed law and submit a counter proposal for the ballot. These three directives are the only options given to the Legislature when presented with an initiative proposal under this section of the Constitution. Importantly, each is a specified action that must be taken during the 40-session day time period. Unlike initiated laws approved by the voters, no other constitutional directives or restrictions are placed on the Legislature relative to initiated proposals enacted by the Legislature during that 40-session day time period. And, once enacted, these public acts were on the same footing as any other legislation passed by the Legislature, *Frey*, 162 Mich App at 600, meaning they are subject to amendment at any time, and not only after the start of the next legislative session or expiration of the 90-day referendum period.

### b. THE PEOPLE PLACED THE REQUESTED LIMITATION ON THE LEGISLATURE, BUT ONLY FOR REFERENDUMS

---

[5] The constitutional history of the initiative in Michigan, discussed somewhat more expansively later, reveals that one of its primary purposes was to ensure that the Legislature responded to a proposed law submitted by the people, something the people apparently felt had not occurred in the past. See, e.g., *Woodland v Mich Citizens Lobby*, 423 Mich 188, 218; 378 NW2d 337 (1985).

Further supporting this common understanding of art 2, § 9 is the fact that in art 2, § 9, the people did preclude the Legislature from amending a law during the same legislative session, *but only as to referendums*. Any reasoned person reading this proposed constitutional provision in 1963 would have concluded that the limitation on amendments during the same legislative session only applied to referendums, for that is what it plainly states. And, because that specific limitation was not placed on initiated laws, that same reasoned person would understand that the Legislature could amend during the same legislative session any law adopted during the 40-session day period.

To conclude, as the trial court essentially did, that this same limitation *also* applies to initiated laws all but ignores that the people chose to place that specific limitation on the Legislature for referendums, but chose *not* to place that same limitation on the Legislature when it came to initiated laws.[6] Reading the Constitution in this strained manner not only would be inconsistent with the common understanding of art 2, § 9's plain language, but it would be contrary to long-standing principles of construction. Although "the maxim *expressio unius est exclusio alterius* cannot be strictly applied when construing provisions of a state Constitution, where to do so would do manifest violence to the plain intent of the framers," *Frey*, 429 Mich at 337 (citation omitted), applying that doctrine here is consistent with the common understanding of the constitutional provision. See also *AFSCME v Detroit*, 468 Mich 388, 412; 662 NW2d 695 (2003) ("[w]e cannot read into the [Constitution] what is not there") (citation omitted). That art 2, § 9, precludes the Legislature from amending a law subject to the referendum until the next legislative session is strong evidence that the people did not intend for that same restriction to apply to initiated laws.

The importance and precision of the restrictions placed on both the initiative and referendum within art 2, § 9 cannot be overstated, as they reveal a careful consideration of what protections are necessary to safeguard each provision. For, in reading art 2, § 9, it is evident that the people approved placing specific, tailored, and sometimes different restrictions on the Legislature for both initiated laws and those subject to referendum. For example, an initiated law approved by voters cannot be amended without the approval of ¾ of both legislative bodies; nor is it subject to a governor's veto. Laws subject to a referendum are suspended until the next general election, and those that are approved through a referendum also cannot be vetoed. And of critical importance to this case, with respect to amending a law approved through referendum, art 2, § 9 prohibits the Legislature from amending the law during the same legislative session, and if an amendment is proposed in a subsequent session, it must receive a vote of two-thirds of both legislative bodies.

These provisions reveal that the people were presented with, and adopted, carefully crafted provisions intending to limit the Legislature's and governor's ability to modify laws approved by the people through a referendum or the initiative process. Importantly, these restrictions were not identical for each process, reflecting a recognition that each process addresses a different situation—the referendum addressing laws already passed through the normal representative

---

[6] As detailed later, the trial court's conclusion is also contrary to the constitutional convention record, which shows delegates *rejected* a proposal to limit the Legislature to amending voter-approved initiated laws only in a subsequent legislative session.

-10-

process, while the initiative proposes new laws to the Legislature. To say that there is no significance to the people limiting legislative amendments during the same legislative session to referendums is to simply ignore the deliberate restrictions the people placed in art 2, § 9.

### c. UNLESS RESTRICTED, THE LEGISLATURE CAN LEGISLATE AS IT SEES FIT

One of the main points articulated by the trial court in holding the adopt and amend procedure unconstitutional was that "the People never granted the Legislature the option to amend a voter-initiated law in the first instance." Indeed, the court went on to denote the adopt and amend procedure as a "fourth option" (along with the three other options that must take place during the 40-session day period) not contained in the Constitution. In so ruling, the trial court misapprehended the constitutional power held by the Legislature. For, as noted earlier in this opinion, unlike Congress that was delegated specific limited authority under the federal Constitution, under the state Constitution the Legislature is free to legislate as it deems appropriate unless specifically prohibited from doing so under the state or federal Constitutions. See *Young*, 267 Mich at 243; *Southeastern Mich Fair Budget Coalition v Killeen*, 153 Mich App 370, 380; 395 NW2d 325 (1986) ("The United States Constitution grants limited authority to the federal government to exercise only those powers that have been expressly or impliedly delegated to it. State constitutions, by contrast, serve as limitations on the otherwise plenary power of state governments.") (citation omitted).

As defendants and their amici argue, the pivotal question is not, as the trial court considered it, whether the Legislature was *granted* the power to adopt and then amend an initiative proposal during the same legislative session.[7] Instead, under long-settled law described above, the germane question is whether there was a constitutional provision *precluding* it. *Young*, 267 Mich at 243; *Attorney General*, 275 Mich at 538 ("The legislative authority of the state can do anything which it is not prohibited from doing by the people through the Constitution of the state or of the United States."); *In re Brewster Street Housing Site*, 291 Mich at 333 (Unlike the federal Constitution, the state Constitution "is not a grant of power to the legislature, but is a limitation upon its powers") (citation omitted); and *Taxpayers of Michigan Against Casinos*, 471 Mich at 327-328 ("Unlike the federal constitution, our Constitution 'is not a grant of power to the Legislature, but is a limitation upon its powers.' Therefore, 'the legislative authority of the state can do anything which it is not prohibited from doing by the people through the Constitution of the State or the United States.' ") (citations omitted). Because there are no limitations with respect to the amendment of initiated laws beyond the initial 40-session day period for legislative action, the Legislature is free to amend laws adopted through the initiative process during the same legislative session. This is consistent with the conclusion in *Frey* that the initiative is subject to other constitutional powers prescribed for the Legislature that are not specifically prohibited by that section. *Frey*, 429 Mich at 337. And,

---

[7] Importantly, because no party challenges the Legislature's power to amend an initiated law enacted by the Legislature, the only question is timing, i.e., whether it can be done during the same legislative session. The trial court also recognized this fact, and although at times it was unclear about whether an enacted initiative could *ever* be amended, its ultimate holding was limited to whether amendment could occur during the same legislative session.

as explained below, none of the remaining arguments offered by plaintiffs, and adopted by the trial court, require a different conclusion.

### d. THE ADOPT AND AMEND PROCEDURE DOES NOT INTERFERE WITH THE REFERENDUM PROCESS

One of plaintiffs' main arguments is that amendment of initiated laws during the same legislative session would preclude the people from exercising the right of referendum over 2018 PAs 337 and 338. But allowing amendment of those public acts during the same legislative session in which they were enacted does not interfere with the ability to seek a referendum on these original laws. It is undisputed that both PA 337 and 338 were not given immediate effect and thus would not become effective until *sine die*, meaning 90 days after the end of the 2018 legislative session. Const 1963, art 4, § 27; *In re House of Representatives Request for Advisory Opinion Regarding Constitutionality of 2018 PA 368 & 369*, 505 Mich at 885 (CLEMENT, J., concurring). The same timetable applies to a referendum, which must also occur within 90 days of the end of the legislative session in which the statute was passed. Art 2, § 9. Because of these similar time frames, the right to referendum concluded at approximately the same time PA 337 and 338 would become effective.[8] There is no timing impediment to the exercise of a referendum on these public acts. See *Frey*, 162 Mich App at 601-603 (recognizing that an initiated law enacted by the Legislature goes into effect 90 days after the end of the legislative session, and that all initiated laws are subject to referendum, which also must occur within 90 days from the end of the legislative session).[9] There is likewise nothing within the state Constitution that precludes a referendum on a law that is subsequently amended. The original laws, or the laws as amended, or all four, are separately identifiable public acts that are subject to referendum until the time authorized by art 2, § 9 expires.[10] *Reynolds v Bureau of State Lottery*, 240 Mich App 84, 97; 610 NW2d 597 (2000).

### e. THE ADOPT AND AMEND PROCEDURE IS NOT INCONSISTENT WITH THE GENERAL PURPOSE OF INITIATIVES

Much of the trial court's opinion focuses on what it concluded to be the general intent and purpose of the initiative provision. Specifically, the trial court opined that the adopt and amend procedure was in contravention of the general purpose and intent of art 2, § 9 and subverted the

---

[8] No referendums were filed against 2018 PAs 337 & 338.

[9] Not only does the constitutional text support this conclusion, but so do the comments made at the constitutional convention. There, delegate Richard Kuhn recognized that "[a]fter a statute is passed by the legislature, there are 90 days before it goes into effect. And the reason for this 90 days is to give the people time to go out and get those [referendum] petitions." *Frey*, 162 Mich App at 595 (emphasis omitted), quoting 2 Official Record, Constitutional Convention 1961, p 2395.

[10] The circumstances in *Keep Michigan Wolves Protected v Michigan*, unpublished per curiam opinion of the Court of Appeals, issued November 22, 2016 (Docket No. 328604), reveal that both a public act and its subsequent amendments—which are separate public acts—can be subject to referendum, and successful ones at that.

right of the people to the initiative because it kept the proposals from the ballot where, if approved, the laws would have been more difficult to amend because of the "super-majority" vote requirement. We have two answers to this concern. First, because we believe that the actual language of the proposed Constitution constitutes the best evidence of the common understanding, *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642, 652; 698 NW2d 350 (2005), we have relied on the common understanding of the relatively straight-forward language of this constitutional provision for our holding. *Goldstone v Bloomfield Twp Pub Library*, 479 Mich 554, 560 n4; 737 NW2d 476 (2007). That language allows the Legislature to adopt a proposal in toto, and there are no express restrictions on subsequently amending the laws during the same session. Second, as detailed below, the constitutional convention record evidencing the purpose and intent of art 2, § 9 supports our conclusion.

Aside from the actual language contained in the Constitution, another source of intent behind a provision are the thoughts of those who drafted the Constitution. *People v Tanner*, 496 Mich 199, 226; 853 NW2d 653 (2014) ("When interpreting a constitutional provision, '[r]egard must also be given to the circumstances leading to the adoption of the provision and the purpose sought to be accomplished.' "), quoting *People v Nash*, 418 Mich 196, 209; 341 NW2d 439 (1983). To that end, "[t]he primary focus should be on 'any statements [the delegates] may have made that would have shed light on why they chose to employ the particular terms they used in drafting the provision to aid in discerning what the common understanding of those terms would have been when the provision was ratified by the people.' " *Tanner*, 496 Mich at 226-227, quoting *Studier*, 472 Mich at 656-657. See also *House Speaker*, 443 Mich at 580-581 ("[T]he most instructive tool for discerning the circumstances surrounding the adoption of the provision is the floor debates in the Constitutional Convention record.").

The history of the statutory[11] initiative, since its addition to the Constitution in 1913, reveals that its primary purposes are to (1) allow the people a direct channel to legislate on matters, and (2) require the Legislature to act upon any proposal submitted. The historical backdrop to the initiative was recognized in *Hamilton v Secretary of State*, 227 Mich 111, 130; 198 NW 843 (1924), and reveals that unfulfilled campaign promises from those elected to the Legislature were a significant impetus to adding an initiative provision into the Constitution:

> The initiative found its birth in the fact that political parties repeatedly made promises to the electorate both in and out of their platforms to favor and pass certain legislation for which there was a popular demand. As soon as election was over, their promises were forgotten, and no effort was made to redeem them. These promises were made so often and then forgotten that the electorate at last through sheer desperation took matters into its own hands and constructed a constitutional procedure by which it could effect changes in the Constitution and bring about desired legislation without the aid of the legislature.

Accord: *League of Women Voters*, 508 Mich at 538. "Indeed, the initiative process has been described as 'assur[ing] the citizenry of a gun-behind-the-door to be taken up on those occasions

---

[11] The 1908 constitution had an initiative provision, but it only applied to initiatives to amend the constitution. *Frey*, 429 Mich at 329 n 7.

when the Legislature itself does not respond to popular demands.'" *Woodland v Mich Citizens Lobby*, 423 Mich 188, 217; 378 NW2d 337 (1985), quoting Lederle, "The Legislative Article," in Pealy (Ed), *The Voter and the Michigan Constitution in 1958*, p. 47. The initiative process adopted into the Constitution in 1913, and as slightly modified over the years up to the present art 2, § 9, addresses these concerns by (1) forcing the Legislature to respond to what at least eight percent of the voters think should be a law, and to respond within a short time frame, and (2) allowing all qualified voters to express their views on the proposed law if the Legislature does not act.

The constitutional convention record also provides evidence about the Legislature's ability to amend initiated laws. The interplay between the initiative provision and the power of the Legislature was addressed during the discussion on the amendments that became art 2, § 9. Specifically, on April 12, 1962, delegates discussed several aspects of what was proposed by a committee to be the slightly revised initiative and referendum provision, including what percentage of voters should be required to sign an initiative petition, and whether the provision would be self-executing. During that discussion, convention delegate Richard D. Kuhn, who was on the committee and appeared to be the lead on what was to become art 2, § 9, spoke on these two issues:

> MR. KUHN: . . . I would like to assure Dr. Nord that no one on the committee has any idea that this will not be a self executing proposal, and that if the legislature failed to move, that it would be my intent—and I would want it on the record—that that state official, as we put it in there, would mean the secretary of state if they do not act; that it is a mandatory thing upon the legislature to move;
>
> \* \* \*
>
> Yes, it's true, Michigan says 8 per cent. Why is this important? It's important because the legislative power should be in the house and senate. Now, if they do not see fit to move on a proposition that the people seem to think is important, then the people have a right. It was only used once successfully. Now, this doesn't mean that it is not a good thing; because the legislature can always keep this in the back of their minds . . . .
>
> They must accept it within 40 days, and accept it in toto, or they must place it on the ballot. *Now, what happens if they place it on the ballot and the people adopt it? They lose control of it. They can't amend it, they can't repeal it, and they can't change it in any way unless the people give them consent in their initiative petition, or unless they go back to the people and ask them to do this.* This makes it rather strong.
>
> The only time we have had an initiative matter that went through was the oleomargarine back in 1950. *The legislature saw what the people wanted, and had the pulse and the feeling, and adopted it to get away from this control factor so that they could keep control of the matter.* [2 Official Record, Constitutional Convention 1961, p 2394 (emphasis added).]

Later, a colloquy between delegates Wagner and Kuhn resulted in additional statements about the power of the Legislature to amend laws enacted through the initiative process:

-14-

MR. WAGNER: Yes. A brief question for Mr. Kuhn, Mr. Chairman. Mr. Kuhn, isn't there another difference between initiative and referendum, namely: that referendum cannot result in having a statute on the books which it takes a popular vote to repeal? Whereas, the initiative, if the initiated statute is adopted, means that the people, in order to make any changes in that statute, have to vote; and the legislature cannot vote to change it.

MR. KUHN: Well, not exactly. I'll try to explain this a little bit, Mr. Wagner. *If the legislature sees fit to adopt the petition of the initiative as being sent out, if the legislature in their wisdom feel it looks like it is going to be good, and they adopt it in toto, then they have full control. They can amend it and do anything they see fit.* But if they do not, and you start an initiative petition and it goes through and is adopted by the people without the legislature doing it, then they are precluded from disturbing it. [*Id.*, p 2395.]

These statements from delegate Kuhn reflect an understanding of the text of art 2, § 9 that comports with our ruling. As delegate Kuhn recognized, if the Legislature enacts an initiative proposal, it retains full control over the legislation, and is not constrained by the stringent limitations on amendment provided for initiated laws passed directly by the people. Although there is no discussion regarding when the amendment power can be used for legislatively enacted laws, delegate Kuhn's reference to the Legislature having "full control" after enacting an initiated law and that the Legislature "can amend it and do anything they see fit" is a recognition of the broad authority of the Legislature to amend initiated laws enacted by that body.[12]

This point-that initiated laws enacted by the Legislature are on the same footing as all other legislation—was previously recognized in *Frey*, where we said that "[s]ince everything that emerges from the legislature is legislation, all legislative acts must be on an equal footing." *Frey*,

---

[12] The trial court discounted delegate Kuhn's convention remarks on the basis that (1) he had made a prior remark that a legislatively adopted initiated law could not be amended during the same session, and (2) he made statements at the convention about how "tough" the initiative process should be, which the trial court presumably read as Kuhn being opposed to the initiative process. Neither assertion is factually based. With respect to the first assertion, the trial court cited no record evidence where Kuhn made any such remark, or anything close to it, and we have located none either. That he stated that the Legislature had the options to either enact in full or reject a proposal, and it would then go to a vote, says nothing about the power to amend once the proposal is enacted. As to the second assertion, the remarks cited by the trial court reflect delegate Kuhn's explanation as to why the committee voted against reducing the percentage requirement for petition signatures from eight to five percent, a proposition that was adopted both by the convention and the people, as the eight percent requirement was retained from the prior constitution. Delegate Kuhn's remarks were not "anti-initiative," but reflected his belief, apparently shared by a majority of the delegates and those voting in favor of the 1963 Constitution, that the initiative process not be made easier than what had existed. Additionally, in *Frey* the Supreme Court relied on delegate Kuhn's comments regarding the meaning of art 2,§ 9. *Frey*, 429 Mich at 324-326.

-15-

162 Mich App at 600. This rule springs from a recognition that with initiated laws the people and the Legislature are considered co-ordinate legislative bodies, and so the Legislature can make necessary amendments to initiated laws consistent with the Constitution:

> The courts have reasoned that the legislative power retained by the people, through the initiative and referendum, does not give any more force or effect to voter-approved legislation than to legislative acts not so approved. Voter-approved acts are on an equal footing with legislation that has not been submitted to the people. Approval by the voters does not lessen the power of the legislature; the initiative and referendum merely take from the legislature the exclusive right to enact laws, at the same time leaving it a co-ordinate legislative body with them [the people]. Some courts have reasoned that experience after the enactment of voter-approved legislation might indicate that legislation was not workable and that in providing for the initiative and referendum the people intended that the legislature possess the power to make needed changes as otherwise there would be no means of doing so before the next election. It has been said by some courts that if the people disagree with a legislative amendment of voter-approved legislation their remedies are the (or another) referendum and, when the legislature stands for re-election, the ballot. [*Advisory Opinion on Constitutionality of 1982 PA 47*, 418 Mich 49, 66; 340 NW2d 817 (1983) (quotation marks and citations omitted)]

As such, once the Legislature enacted 2018 PAs 337 and 338 during the 40-day window, and that window ended, absent some other prohibition the Legislature was free to amend those public acts just as it could amend any other public acts.[13]

Also providing strong historical evidence that the framers did not intend to place any temporal limitations on when initiated laws could be amended comes from another discussion that occurred on that same day in April 1962. On that day delegate Hutchinson offered an amendment to the proposed art 2, § 9, whereby the Legislature would be provided an ability to amend a voter-approved initiated law, but only with a vote of ¾ of each legislative body. After offering that amendment, delegate Kuhn asked whether Mr. Hutchinson's amendment could be amended to include a provision allowing amendment of voter-approved initiated laws only at a subsequent legislative session, a proposal that was ultimately rejected:

> MR. HUTCHINSON: . . . In order to remedy that situation, which I say has never arisen yet in Michigan, but we don't know when it might, I offer this proposition: that the legislature be empowered to amend or even repeal these initiated statutes, but only by a ¾ vote in each house.

> * * *

---

[13] This, of course, is far different from the treatment afforded initiated laws approved by voters. As art 2, § 9 makes clear, initiated laws approved by the voters can only be amended with a ¾ vote of both legislative bodies. This evinces an intent to place more protections on voter-approved laws than those adopted by the Legislature.

-16-

But it will simply provide the machinery whereby in the future the legislature might be able to make necessary changes even in initiated legislation.

\* \* \*

MR. KUHN*:  I was wondering if the gentleman would include in his proposed amendment something to the effect of this being done in a subsequent legislative session; so we wouldn't have to worry about amending it instantly, like it provides down below in a few sentences.*  If we could perfect something like that, I don't think the committee would have any objection.

\* \* \*

MR. HUTCHINSON:  However, the reason I didn't offer it at this time is because in talking with the members of the committee, including Mr. Downs, *we thought that this ¾ vote requirement would be a sufficient safeguard and that the time element would become very secondary*.

\* \* \*

MR. DOWNS:  *I prefer it a little bit to the time concept.  I think it is a little better way to handle the problem.  I therefore will speak in support of the amendment*.  [2 Official Record, Constitutional Convention 1961, p 2396 (emphasis added).]

This discussion between the delegates shows specific deliberation over whether there should be a provision added to art 2, § 9 that would preclude amending voter-approved initiated laws until the next legislative session.  But after that deliberation, the proposal was rejected as being secondary to the stronger ¾ approval provision that ultimately ended up in art 2, §9.  Importantly, this proposal-which entailed the same provision as adopted for referendums-was proposed for voter-initiated laws, which are considered worthy of more protection from amendment than legislatively enacted ones.  Yet, it was still rejected.  The constitutional convention record squarely supports the conclusion that there was no intention to place a temporal limit on when the Legislature could amend initiated laws enacted by the Legislature.[14]

One final argument forcefully put forward by the Attorney General is that by adopting the two proposals with the concurrent intent to substantially revise them, the Legislature in effect eliminated the right for the people to vote on the proposals, or alternative ones from the Legislature.

---

[14] The trial court relied in part on the Address to the People to support its conclusion that the Legislature could not adopt in full an initiative proposal, and then amend it that same session, stating that the drafters of art 2, § 9 were attempting "to prevent the Legislature from 'thwarting' the popular will, as expressed in the initiative."  What the Address actually says is that art 2, § 9 is "self-executing and the legislature cannot thwart the popular will *by refusing to act*," which is consistent with the historical purpose of art 2, § 9, i.e., to force the legislature to *respond* to a proposal submitted by the people.  The Address was not referring to the "popular will" in a general sense, but as to the specific purpose actually stated.

In essence the argument is that if this Legislature wanted to change the terms of the proposals, its only remedy was to offer an alternative for the ballot, not to amend it later in the same legislative session. This argument has facial appeal, but in the end cannot be accepted given the structure and language of art 2, § 9.

As we have attempted to make clear, (1) the absence of any prohibition on the Legislature amending initiated laws during the same session, (2) the delegates rejection of that exact limitation for voter-approved initiated laws, (3) the inclusion of this exact prohibition for laws approved through a referendum, and (4) the otherwise broad power of the Legislature to act, compel the conclusion that the Legislature is not prohibited from amending an initiated law enacted by the Legislature during the same legislative session. Adding to that is the fact that the option to offer an alternative proposal for the ballot is both permissive and is an act that is required to be done (if exercised) *during the 40-session day window*. It is not a prohibition on what the Legislature can do *after* it has properly acted during that 40-session day time frame. In other words, the option to also offer an alternative proposal is not the exclusive remedy for the Legislature that adopted the measure, and there is nothing in the text of the Constitution or in the historical evidence to suggest otherwise.

### f. ANY MOTIVES OF THE LEGISLATURE IN ADOPTING AND AMENDING ARE IRRELEVANT

In its opinion, the trial court remarked that the state had not refuted that the Legislature "took its actions with the specific and intended purpose of circumventing the People's right to initiative." We have several observations to this point. First, to the extent the trial court focused on the perceived intent of the Legislature, it has been the law of this state for more than 100 years that the motivations in passing legislation are irrelevant. *People v Gibbs*, 186 Mich 127, 134-135; 152 NW 1053 (1915) ("Courts are not concerned with the motives which actuate members of a legislative body in enacting a law, but in the results of their action. Bad motives might inspire a law which appeared on its face and proved valid and beneficial, while a bad and invalid law might be, and sometimes is, passed with good intent and the best of motives."). Courts are concerned with what the law states, i.e., what the words actually contained in the law state, and a constitutional law does not become unconstitutional because it was passed with a bad intent. See *Zilich v Longo*, 34 F 3d 359, 363 (CA 6, 1994) ("We may not invalidate such legislative action based on the allegedly improper motives of legislators."), and *Kerr-McGee Chemical Corp v Edgar*, 837 F Supp 927, 938 (ND Ill, 1993), citing *United States v O'Brien*, 391 US 367, 382-383; 88 S Ct 1673; 20 L Ed 2d 672 (1968).[15]

---

[15] The trial court and plaintiffs place significant emphasis on Attorney General Frank Kelley's opinion from 1964, OAG 1963-1964, No. 4303 (March 16, 1964), which states without discussion that "the legislature enacting an initiative petition proposal cannot amend the law so enacted at the same legislative session without violation of the spirit and letter of Article II, Sec. 9 … ." We place little value on this opinion. For one, there is no discussion about *how* this conclusion is supported by the text of the constitution, and so while some persuasive value can be placed on Attorney General opinions that *do* contain a rationale, persuasiveness is greatly diminished by the

Second, upholding the adopt and amend procedure does not diminish the initiative process, just as the rulings did not in *Mich Farm Bureau* and *In re Proposals D & H*, 417 Mich 409; 339 NW2d 848 (1983). In both of those decisions, the Court upheld legislative action that could be perceived to be limiting the power of the initiative or referendum, but were nevertheless upheld because the Constitution did not prohibit the action taken. See *Mich Farm Bureau*, 379 Mich at 396 (art 2, § 9 does not bar re-enactment by the Legislature of the same or similar measures contained in legislation that has been suspended by certification of a petition for referendum), and *In re Proposals D & H*, 417 Mich at 421 (holding that the filing of an initiative petition does not suspend the Legislature's authority to act on the same subject under art 4, § 34).

Most importantly, our reading of art 2, § 9 is not a strained one, but is true to the common understanding of the words contained in the Constitution, and the history of art 2, § 9. As detailed earlier, the main purpose of the initiative was to provide the people with an avenue to force the Legislature to address a subject that the people felt needed to be addressed. Art 2, § 9 does that by requiring legislative action within 40 session days of the proposals' submission. Here, that was accomplished: the Legislature, in the words of delegate Kuhn, "took control" of both issues by adopting them in toto, and on a timely basis. Thus, the initiatives successfully forced the Legislature to act on the policies contained in the proposals. Then, in amending the proposals, the Legislature continued to address those issues with all the legislators' constituents' interests in mind. These circumstances show that this initiative process was not only consistent with the process contained in art 2, § 9, but was consistent with the purpose of the provision: to obtain legislative action on a subject matter of concern to the people (or at least eight percent of them).

Third, and finally, our holding does no damage to the right of referendum, as the original laws as enacted into public acts, or the public acts that contained the amendments, remain subject to a referendum as specified in art 2, § 9.

III. CONCLUSION

The opinion and order of the trial court is reversed, and the matter is remanded for entry of an order granting the state defendant's motion for summary disposition. No costs, a matter of

---

absence of any supporting rationale. Second, there are two other Attorney General opinions—including one from Attorney General Kelley—that either comes to the opposite conclusion, or seems to recognize the unfettered ability to amend legislatively approved initiated laws. See OAG 1975-1976, No. 4932 (January 15, 1976) ("If a measure proposed by initiative petition is enacted by the legislature within 40 session days without change or amendment, the legislature can amend or repeal such a measure by majority votes in each house . . . .") and OAG 2017-2018, No. 7306 (December 3, 2018) (concluding amending 2018 PAs 337 and 338 was constitutional under art 2, § 9). Although Attorney General Schuette's opinion exclusively addresses this issue and contains a thorough analysis supporting its conclusion, the trial court opted to rely on the 1964 opinion because of when it was decided. However, even though it was decided close in time to the adoption of the 1963 Constitution, the most relevant historical evidence is that of the convention delegates, *House Speaker*, 443 Mich at 580-581, and those comments support our conclusion of the common understanding of art 2, § 9.

public interest being involved.  MCR 7.219(A).  This opinion is to have immediate effect.  MCR 7.215(F).


/s/ Christopher M. Murray